No. 46,949

NATIONAL EDUCATION ASSOCIATION OF SHAWNEE MISSION, INC., *Appellant and Cross-Appellee,* v. BOARD OF EDUCATION OF SHAWNEE MISSION UNIFIED SCHOOL DISTRICT No. 512, JOHNSON COUNTY, KANSAS, *Appellee and Cross-Appellant.*

(512 P. 2d 426)

Opinion filed July 14, 1973.

*Ward D. Martin,* of Crane, Martin, Claussen, Hamilton and Barry, of Topeka, argued the cause and was on the brief for the appellant and cross-appellee.

*Robert F. Bennett,* of Bennett, Lytle and Wetzler, of Prairie Village, argued the cause, and *John L. Vratil,* of the same firm, was with him on the brief for the appellee and cross-appellant.

*William G. Haynes,* of Eidson, Lewis, Porter and Haynes, of Topeka, submitted a brief on behalf of U. S. D. No. 501, Shawnee County, Kansas, *amicus curiae.*

The opinion of the court was delivered by

FOTH, C.: In this case we are called upon for the first time to examine the substantive provisions of the Kansas professional negotiations act ("the act"), which expressly recognizes the right of professional employees of school boards to negotiate collectively with respect to terms and conditions of professional services. Our only previous encounter with the act was limited to its recognition-

nonrecognition procedures, in *Liberal-NEA v. Board of Education*, 211 Kan. 219, 505 P. 2d 651.

The plaintiff, National Education Association of Shawnee Mission, Inc. ("NEA"), is a voluntary association of certificated teachers employed by the defendant Board of Education of Shawnee Mission Unified School District No. 512, Johnson County, Kansas ("the Board"). At the time of trial NEA had a membership of about 1500, out of approximately 2250 teachers employed by the Board.

The controversy before us is an immediate aftermath of the 1970 legislative enactment of the act, now appearing as K. S. A. 72-5413 *et seq.* It became effective July 1, 1970, and within two weeks NEA applied for recognition as the exclusive representative of all professional employees of the district (except administrative employees) for the purpose of professional negotiations. Such recognition was duly granted on August 10, 1970.

There followed the first tentative groping for position: In September NEA requested negotiation of the 1970-71 school calendar; the Board noted some urgency in settling the matter, but solicited suggestions. In November negotiating teams from each side held three meetings, reached a consensus, and submitted the agreed calendar to their respective principals for ratification. Both agreed, and the first negotiating effort under the new act was successfully concluded.

This, however, was but a preliminary skirmish; the main battle was yet to come. On December 1, the last date for doing so under K. S. A. 72-5423, the parties exchanged notices of the items about which they desired to negotiate for the following school year. The Board's notice contained two items: an acknowledgement that management rights were vested in the Board, and a no-strike no-lockout agreement. NEA's notice contained a proposed master contract of 123 pages, containing 22 sections and 122 subsections covering everything from sick leave to curriculum.

It seems fair to say that these two proposals epitomized the parties' positions throughout the ensuing proceedings; the Board took the position that virtually nothing was negotiable, while NEA claimed that everything was.

With the lines thus drawn the parties proceeded the next day to the first order of business, which was drawing up ground rules for their future meetings. This proved to be the first insurmountable hurdle; they were unable to agree on ground rules at meetings held

on December 2, 10, and 18, 1970, and on January 5, 14, 21 and 26, 1971. It is apparent that this was the first test of strength. After seven meetings over two months the antagonists were still unable to agree on how many meetings there would be, how long they would negotiate, or a procedure for resolving impasses. At this point the negotiators decided by mutual consent to go on to consider substantive proposals, without ground rules.

On February 2, 1971, substantive negotiations began. At this meeting the Board's basic position was solidified: all matters, whether "negotiable" under the act or not, which represented Board "policies" must always remain subject to unilateral change by the Board. Hence the Board would not consider entering into a master contract concerning terms and conditions of professional service, nor would any of its policies with respect thereto be incorporated by reference in an individual teacher's contract. The Board would lend a respectful ear to the teachers' suggestions as to what its policies should be, but it reserved not only the final say on adopting policy but also on changing it at will.

NEA, on the other hand, retreated from its demand for a comprehensive master contract, but insisted that agreed upon policies affecting terms and conditions of professional service be at least incorporated in individual contracts so as to bind the Board during the contractual period. This fundamental difference continued throughout all subsequent negotiations and throughout this litigation.

On February 9 the teams met again, and at this meeting the Board announced its intention to cease negotiations on March 8, 1971. This, it was claimed, was necessary in order to submit contracts to teachers on or before March 15, the last date to terminate a teacher's employment under the continuing contract law (K. S. A. 72-5411). To support its position the Board had an opinion of counsel to that effect.

The next meeting was a week later, on February 16; thereafter the pace picked up somewhat. Meetings were held on February 18, 23 and 25. At the last mentioned meeting the Board's team enumerated an extensive list of items of the NEA proposal which the Board considered "non-negotiable," most because they were regarded as "prerogatives of management," or because they were existing policy, or both. The Board reaffirmed its determination to break off negotiations on March 8, adopt a salary schedule on March 9, and issue teacher contracts before March 15.

On March 1, 1971, this mandamus action was filed by NEA, asking that the Board be compelled to continue negotiations and for a temporary restraining order and a temporary injunction against the impending termination of negotiations. The temporary restraining order was granted *ex parte,* and the trial court held a hearing on March 8 on the temporary injunction. On March 11 the court entered findings of fact and conclusions of law resulting in a temporary order in mandamus requiring the Board to continue negotiations and restraining it from issuing teacher contracts before April 15.

Two meetings were held in early March, before the March 8th hearing, and as a result of the court's order some fourteen more were held between March 11 and April 15. On the latter date the last meeting of the year was held. Although some NEA suggestions were unilaterally adopted as Board policies, no binding agreement was ever reached on anything, and in particular no salary schedule was agreed upon. On April 22 the Board adopted the salary schedule it had last proposed, and it issued teachers' contracts around May 6.

Beginning June 25, 1971, this case was tried to the court. On December 10, 1971, it filed extensive and detailed findings of fact and conclusions of law resulting in (1) a permanent order of mandamus compelling the Board to negotiate with NEA, but only in the rather limited manner which the court found was all the law required, and which will be discussed later, and (2) denying attorney fees to the plaintiff NEA. The court specifically found that both parties had negotiated in a good faith effort to comply with the law as they understood it.

NEA has appealed from that part of the judgment which limited the Board's duty to negotiate and which denied attorney fees; the Board cross-appealed from that part of the judgment which compelled negotiations after March 15. Initially the Board also challenged the constitutionality of the act, but that point has now been abandoned. Both parties seek guidance as to their rights and duties under the act.

## I. THE DUTY TO NEGOTIATE.

The first and most fundamental issue separating the parties is their different view of the underlying objective of negotiations. Each approaches the problem by seeking to pin a label on the act: NEA would have it be a "collective bargaining" act, under which

the parties are required to reach a binding agreement; while the Board says it is but a "meet and confer" act, under which its duty is merely to listen to the teachers and then make up its own mind.

The terms are defined in the Report on *Labor-Management Policies for State and Local Government* by the Advisory Commission on Intergovernmental Relations, 1969. (Superintendent of Documents, U. S. Government Printing Office, Washington, D. C. 20402. Hereinafter cited as "the Commission Report."):

*"Collective Bargaining or Negotiations.* A method of determining conditions of employment through bilateral negotiations between representatives of the employer and employee organizations. These parties are required by law to reach a settlement which is set forth in writing and which is mutually binding. The National Labor Relations Act defines the process as 'the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession. . . .' "

*"Meet and Confer.* A method of determining conditions of public employment through discussions between representatives of the employer and employee organizations. These parties are required by law to endeavor to reach an agreement on matters within the scope of representation. If agreement is reached, it is reduced to a memorandum of understanding and presented to a jurisdiction's governing body or its statutory representative for final determination.

*"Memorandum of Understanding, Meet and Confer.* A written, non-binding, record of recommendations mutually agreed upon by an employer and employee organization concerning the conditions of employment (wages, hours, vacations, holidays, overtime, etc., and the procedures to be followed in settling disputes or handling issues that arise during the terms of the memorandum. Such memoranda are prepared for submission to the executive or legislative body and shall become effective when such executive or legislature takes the necessary implementary action."

The court below apparently agreed generally with the Board, for it concluded: "That collective negotiation statutes, in essence, require mandatory meet and confer negotiations between teacher representatives and the school board in anticipation that such negotiations will provide agreement. They do not require and make mandatory collective bargaining that is customary in collective bargaining as is found with labor unions and industry."

We would caution that we are not concerned at this point with what are proper *subjects* for negotiation under the act—that issue

will be treated later. What we are talking about now is the *objective* of negotiations, on matters which are undeniably "negotiable."

At the outset a broad outline of the entire act may be helpful. We quote where exact language is important to the present case, and emphasize that which seems controlling:

Section 72-5413: Definitions. The key definition in this case is (g):

" 'Professional negotiation' means meeting, conferring, consulting and discussing *in a good faith effort by both parties to reach agreement* with respect to the terms and conditions of professional service."

Section 72-5414: Authorizes employees to form and join organizations and "to participate in professional negotiation with boards of education through representatives of their own choosing for the purpose of establishing, maintaining, protecting or improving terms and conditions of professional service."

Section 72-5415: Authorizes recognition of exclusive representatives.

Sections 72-5416 through 5420: Provide recognition procedures.

Section 72-5421: "A board of education and a representatives selected or designated pursuant to the provisions of sections 3 [72-5415] to 8 [72-5420] of this act may enter into an agreement covering terms and conditions of professional service. *Such agreements become binding when ratified* by a majority of the members of the board of education and a majority of the members of the applicable negotiating unit."

Section 72-5422: Saves existing agreements.

Section 72-5423: "(*a*) Nothing in sections 1 [72-5413] to 12 [72-5424], inclusive, of this act shall be construed to change or affect any right or duty conferred or imposed by law upon any board of education, *except that boards of education are required to comply with this act in recognizing professional employees' organizations*, and when such an organization is recognized, the board of education and the professional employees' organization *shall enter into professional negotiations* prior to issuance of the annual teachers' contracts or renewal of the same on request of either party: *Provided*, That notices to negotiate on new items or to amend an existing contract must be filed on or before December 1 in any school year by either party. . . .

"(*b*) Nothing in this act shall be construed to authorize a strike by professional employees.

"(*c*) Any agreement lawfully made under the provisions of this

act may be adopted by reference and made a part of the employment contract between any professional employee of the applicable negotiating unit and a board of education for a period of not to exceed two years."

Section 72-5424: Authorizes agreements to contain enforceable binding arbitration clauses.

Section 72-5425: Severability.

In support of its position the Board points to the absence from the act of any procedure for resolving impasses, and to the use of the permissive "may" in 72-5421, providing that the parties "may" enter into an agreement covering terms and conditions of professional service. It notes also the constitutional provision (Art. VI, § 5) and the statutes (K. S. A. 72-1623 and 72-8205) which in general terms vest the management and control of the affairs of a school district in its board of education. All such power, says the Board, is reserved to it by the express terms of 72-5423 (a), quoted above.

We think the Board's analysis glosses over some important terms. The reservation-of-powers in 72-5423 (a) is subject to the important exception that the Board is "*required* to comply with this act in recognizing professional employees' organizations" as exclusive representatives for professional negotiations. Further, when such an organization is recognized, the Board "*shall* enter into professional negotiations." This is a limitation on the Board's autonomy of no small dimensions, particularly when one re-examines the definition of "professional negotiations."

That term, under 72-5413 (g), means not only meeting and conferring but doing so "in a good faith effort by both parties *to reach agreement.*" We think this is where the Board's determination not to be bound runs afoul of the act. If a board were merely required to "meet and confer," there would be no need for the legislative mandates of good faith and a mutual effort to reach agreement. "Agreement," in particular, is hardly necessary if the Board is to be free to ignore what is agreed upon.

By the same token, the act's elaborate procedures dealing with recognition (dealt with in *Liberal-NEA v. Board of Education,* supra) would seem an exercise in futility if the duly selected and exclusive negotiating agent could do no more than make suggestions, which the Board is then free to ignore. Although many unadulterated "meet and confer" acts do contain such provisions, we can only say that such acts are, for that reason, subject to the same observation. They offer more to the eye than to the touch.

The feature of the act which we think militates most strongly against the rigidity of the Board's position is the statutory provision that agreements when ratified by *both parties* are "binding." This is in contrast to the unilateral "implementary action" to make a "memorandum of agreement" effective, as contemplated by the "meet and confer" definitions of the Commission Report, supra. (Such language, we note, *is* used in the 1971 Public Employer-Employee Relations Act, in K. S. A. 1972 Supp. 75-4322 (*m*), 75-4330, 75-4331 and 75-4332.) In addition, the act states that such agreements may provide for binding arbitration of disputes. That any such agreement is in severe derogation of the traditional powers of a board of education is obvious, yet the legislature saw fit to authorize them.

If we understand the Board correctly it concedes its duty to meet and confer, and the requirement of a good faith effort to reach agreement. We think the act, read as a whole, requires it to go one step farther: if it does reach agreement we think the Board is required to reduce the agreement to writing and be bound by it. This may be done either by a master contract with the professional employees organization (72-5421) or by agreed policies incorporated by reference in the individual teachers' contracts (72-5423 [*c*]).

Of course, and we emphasize this, agreement by the negotiating teams is not enough. Board ratification is required on the one hand, which presumably will be recommended in good faith by the Board's team and considered in good faith by the Board. On the other, ratification is required by a majority of the entire negotiating unit, not just of the negotiating organization. Again, a good faith recommendation of ratification by the organization's negotiating team is to be expected. Only when so ratified does an agreement become binding.

In reaching this conclusion we recognize the differences, noted by the court below, between collective negotiations by public employees and "collective bargaining" as it is established in the private sector, in particular by the National Labor Relations Act. Because of such differences federal decisions cannot be regarded as controlling precedent, although some may have value in areas where the language and philosophy of the acts are analogous. See K. S. A. 1972 Supp. 75-4333 (*c*), expressing this policy with respect to the Public Employer-Employee Relations Act. We do not, however, believe those differences prevent our reaching the conclusion

that a public employer may negotiate and be bound by its agreements relating to terms and conditions of employment.

The prime subject of most negotiating encounters will suffice to illustrate the point. While public employers have limited resources with which to pay wages and salaries demanded across the bargaining table, they do have some flexibility in ordering priorities in their budget. A school board can, for example, pay larger salaries at the expense of supplies or library books. Thus proposals and counter-proposals for a salary schedule played a prominent role in the "negotiations" in this case. No agreement was reached, but in due course contracts calling for fixed salaries were offered to the district's teachers.

We note at this point that if the Board's argument were pushed to its limits, it would necessarily follow that such contracts are not binding upon it—they do, after all, purport to limit the Board's prerogative to change its mind on the most vital and fundamental matter entrusted to its custody and control, *i. e.*, the expenditure of the taxpayer's money. The Board, of course, does not so contend, and at least to that extent concedes that it *can* make agreements on terms and conditions of professional service which will be binding upon it.

## II. SUBJECTS OF NEGOTIATION.

Once it is established that the duty to make a good faith effort to reach agreement encompasses a duty to make binding agreements where accord is in fact reached, the next question is what areas are proper subjects for negotiation and agreement. The statute speaks only of "terms and conditions of professional service."

On this issue the trial court found "that the school district is not compelled to maintain collective negotiations with the plaintiff association over matters of basic policy. Such matters are the exclusive legal responsibility of the school board in the exercise of its delegated authority." It went on to say:

"The Court concludes that the words 'terms and conditions of professional service' refer to the following areas:

"Salaries and wages; hours and amounts of work; vacation allowance; holiday, sick and other leave; number of holidays; retirement; insurance benefits; wearing apparel; pay for overtime; jury duty and grievance procedure and such other areas that directly or by implication involve these factors.

"The Court specifically concludes that this does not include educational policies of the school district."

NEA claims that the term is much broader than this, and encompasses any matter which may in any way affect the working conditions of a teacher. In particular, however, they point to two lists of items contained in their original proposal which are not covered by the court's definition of "terms and conditions of professional service." The first contains items which the Board team at a negotiating session stipulated were negotiable—although only in the Board's limited concept of negotiability. This list includes such things as probationary period, transfers, teacher appraisal procedure, disciplinary procedure, and resignations and termination of contacts         .

The second list contains items hotly contested by the Board throughout, including such things as curriculum and materials, payroll mechanics, certification, class size and the use of paraprofessionals, the use and duties of substitute teachers, and teachers', ethics and academic freedom. The Board views most of these matters as peculiarly its own concern, while the last it regards as peculiarly the concern of the teachers. In neither event does it regard them as negotiable.

The problem is not without difficulty. The legislature saw fit not to define the critical term or to list the items it regarded as negotiable. Compare, for example, K. S. A. 1972 Supp. 75-4322 (s) of the Public Employer-Employee Relations Act, where for public employees other than teachers "conditions of employment" is specifically defined in terms generally in line with those adopted by the trial court here.

In an attempt to resolve the issue of legislative intent we look to the legislative history of the act. We find that in the 1969 session of the legislature two competing bills were introduced, Senate Bill 218 and House Bill 1562. Both provided for collective negotiations by teachers. Neither bill passed in that session, but both were referred to committee for interim study.

SB 218 defined professional negotiations as a good faith effort to reach agreement with respect to "the terms and conditions of professional service *and other matters of mutual concern.*" This phraseology, we find, had its origins in the policy formulations of our NEA's parent organization, the National Education Association of Washington, D. C. The executive director of that organization submitted a statement to the Advisory Commission on Intergovernmental Relations when that congressionally-established organization held a public hearing in connection with the study which led to the

Commission Report, supra. The statement included the following policy statement:

"It is our position that private sector definitions are unduly restrictive when applied to teacher-school board negotiation. We believe that a teacher, having committed himself to a career of socially valuable service and having invested years in preparation (and perhaps years of postgraduate study after original hire), has a special identification with the standards of his 'practice' and the quality of the service provided to his 'clientele.' As a result of this identification, teachers characteristically seek to participate in decision-making in respect to teaching methods, curriculum content, educational facilities and other matters designed to change the nature or improve the quality of the educational service being given to the children, and they see negotiation as the vehicle for such participation. Accordingly, we propose that a broad and somewhat open-ended definition of scope of negotiation be adopted—to wit, that a school board be obligated to negotiate in regard to 'the terms and conditions of professional service and other matters of mutual concern.' "

It may be seen that NEA's language was employed verbatim in 1969 SB 218. It was later inserted in the first draft of 1970 HB 1647, which became the 1970 act now under consideration. If given the intent ascribed to it by its authors the language would be broad indeed, and had it been adopted it would have narrowed the concept of "non-negotiable management prerogative" to near zero. It was not adopted, however; in the 1970 legislative process the phrase "and other matters of mutual concern" was stricken. We can only infer from this that "matters of mutual concern" are *not* to be negotiable, but only "terms and conditions of professional service." This, to our mind, eliminates those matters on the NEA's second list such as curriculum and class size. While these may be matters of "concern" to the teacher, we see the legislative action as a deliberate effort to remove such concepts from the area of negotiability.

On the other hand, 1969 HB 1562 was also lost completely in the legislative mill. It contained an extremely limited definition of "conditions of professional services," *i. e.*, the term included "only wages, hours, and other economic conditions of employment." That phrase in turn was defined to mean "salaries and wages; hours and the amounts of work; vacation allowances; holidays; retirement; insurance benefits; wearing apparel; pay for overtime; jury duty pay and grievance procedures." The 1970 legislature rejected this restrictive approach to the matter of negotiability, just as it rejected the expansive approach of the NEA.

The bill finally adopted was clearly a compromise between the demands of—to put it bluntly—labor and management. Neither got all it desired from the legislature. Yet we think the definition of

"terms and conditions" fashioned by the trial court results in the judicial creation of just such a limitation as the legislature was unwilling to adopt. We think the items on NEA's first list—those conceded by the Board team to be negotiable—fall fairly within the phrase "terms and conditions of professional service" and are thus negotiable.

It does little good, we think, to speak of negotiability in terms of "policy" versus something which is not "policy." Salaries are a matter of policy, and so are vacation and sick leaves. Yet we cannot doubt the authority of the Board to negotiate and bind itself on these questions. The key, as we see it, is how direct the impact of an issue is on the well-being of the individual teacher, as opposed to its effect on the operation of the school system as a whole. The line may be hard to draw, but in the absence of more assistance from the legislature the courts must do the best they can. The similar phraseology of the N. L. R. A. has had a similar history of judicial definition. See *Fibreboard Corp. v. Labor Board.*, 379 U. S. 203, 13 L. Ed. 2d 233, 85 S. Ct. 398, and especially the concurring opinion of Stewart, J., at pp. 221-22.

### III. THE TIME FOR NEGOTIATIONS.

The Board urges that it should not have been compelled to negotiate beyond March 15, and points to the terms of K. S. A. 72-5411, part of the continuing contract law. That section requires a board which does not wish to rehire a teacher for the following school year to so notify him on or before March 15. If it fails to do so, the board will find itself bound to employ the teacher for another school year on the same terms as for the current year, at the option of the teacher. The teacher, on the other hand, has until April 15 to reject such a continuation of his present contract. If neither acts, both are bound.

This enactment, however, specifically authorizes the teacher and the board to alter their existing contract "at any time by mutual consent." See *Krahl v. Unified School District*, 212 Kan. 146, 509 P. 2d 1146. This, in practice, was what usually happened in the Shawnee Mission District. The trial court found, and it is not disputed, that in the immediately preceding years new contracts, varying from those currently in force, were issued as follows:

"In 1970 for the 1970-71 school year, the contracts were issued the last week of May, 1970;

"In 1969 for the school year 1969-70, the contracts were issued in the middle of May, 1969;

"In the year 1968 for the school year of 1968-69, the contracts were issued in the middle of May, 1968;

"In 1967 for the school year 1967-68, the contracts were distributed in the last week in April, 1967.

"It has been the custom and practice of the school district to issue contracts in the latter part of May of each year so that the same could be delivered to the teachers before the close of school. Approximately seven days is required to process and distribute the contracts to the teachers, and if the terms are agreed upon and the forms are available by May 15, the contracts could be completed and distributed before the close of school."

It would appear, then, that the March 15th "deadline" really has nothing to do with the issuance of *new* contracts, but only with the termination of *old* contracts. If a new contract were offered to an employee which he found unacceptable, before or after March 15, his refusal to sign would not alone amount to a termination of his employment. Only the statutorily prescribed notice could work that result.

What *is* important from the Board's point of view is that it have its salary obligations fixed in time to prepare its budget (and tax levy) for the next school year. The timetable prescribed by the budget law requires a hearing on the proposed budget not later than August 15 of each year (K. S. A. 1972 Supp. 79-2933; K. S. A. 79-1801). Notice of the hearing must be published not less than ten days before then, or by August 5 (K. S. A. 1972 Supp. 79-2929). Obviously the preparation of the multi-million dollar budget required by a unified school district requires several weeks —the time varying, no doubt, with the size of the district. While the record is silent on the actual time required for this district, it is apparent that if June ended with its salary requirements unknown the district's budget officer would be in serious trouble. (See K. S. A. 1972 Supp. 75-4322 [*u*], fixing July 1 as the "budget submission date" under the Public Employer-Employee Relations Act.)

In this case the trial court fixed April 15 as the last day of required negotiation. As already indicated, we reject the Board's contention that March 15 was the lawful last day—although in a normal case, not beset by the two months of controversy the parties had here over ground rules, that date may well afford ample time to reach either agreement or impasse. We similarly reject NEA's contention that April 15 was too early a cut-off date in this case. While the court might well have allowed more time, we think this

was a matter for the exercise of sound judicial discretion. We cannot say on this record that the trial court abused that discretion.

## IV. UNDERMINING THE NEGOTIATING TEAM.

NEA complains most bitterly of the fact that all the while negotiations were being carried on with respect to Board policies and proposed changes, the Board was in the process of preparing a new policy handbook, at great expense, which was distributed to all certificated personnel of the district in late February or early March, 1971. Its effect, says NEA, was to undermine its negotiating team by showing the hopelessness of its efforts, and was unilateral action of the kind condemned in ordinary labor relations law as an unfair labor practice or a "refusal to bargain." *(Labor Board v. Katz.,* 369 U. S. 736, 8 L. Ed. 2d 230, 82 S. Ct. 1107, and cases cited therein, esp. at n. 10.)

The trial court made a specific finding of fact on this issue:

"Heretofore, defendant has, from time to time, prepared, altered and amended its rules and regulations in the form of policy statements. Prior to the current school year these policy statements were contained in seven separate handbooks. In the summer of 1970, in advance of plaintiff's application for recognition, defendant directed Dr. Babcock to commence a codification of the policy statements into one volume. At the commencement of the school year 1970-71 defendant delivered to its employees the then existing statements of school policy which were the same as were ultimately codified in the policy handbook by Dr. Babcock. The policy handbook is a large looseleaf notebook which, at the time of its introduction into evidence, contained the substance of the same policies contained in the handbooks distributed at the commencement of the school year. Plaintiff, in its proposal of December 1, 1970, and in subsequent meetings of both teams, had requested that, for the school year 1971-72, some of these policies be modified and amended. Plaintiff's team was advised of the books being in the process of preparation on or about February 9, 1971, and the same were ultimately distributed to the employees of the district in the latter part of February or the first part of March of 1971, and the distribution of the handbooks codifying the policy statements for the then current school year had a discouraging effect on defendant's team. The purpose of the distribution of the policy handbooks at that time was to make all policies available to all personnel and other interested persons in one codified volume where policies would be easy to find, and while the circulation of the policy books during the process of negotiations may have had an undesirable effect on plaintiff's team, *there is no evidence indicating that such books were, in fact, circulated for that purpose,* but rather *for a valid school purpose* and that *in any event the policies set forth therein related only to the then current school year and not to policies which were being discussed by the teams relative to the school year 1971-72.* Changes in policies discussed by both teams and approved by the

Board of Education will, in fact, be included in the policy handbook for the school year 1971-72." (Emphasis added.)

NEA doesn't challenge the facts recited in this finding, but argues that the Board's conduct evidences bad faith *per se*. The act, unlike the N. L. R. A. and our Public Employer-Employee Relations Act, contains no list of unfair practices or *per se* violations. It commands only that the parties negotiate "in good faith." As illustrated by the authorities cited, there are a variety of unilateral actions which may conclusively demonstrate an employer's lack of good faith, in the sense that his conduct is utterly inconsistent with a sincere desire to reach an agreement. Where such conduct occurs no amount of protestations of good faith will avail the employer—his actions belie his words. That is not the situation here.

Here, the trial court found that the Board had no intent to subvert the negotiations, but was instead carrying out legitimate school purpose formulated long before negotiations were undertaken. The timing of the distribution perhaps demonstrated a lack of sensitivity to the delicacy of the situation, but we cannot for that reason alone overturn the trial court's finding. The new handbooks were in looseleaf form, so that new policies resulting from the current negotiations could easily be inserted, and that was proposed to be done. On the facts in this case the trial court's finding of good faith on this issue must prevail.

## V. ATTORNEY FEES.

NEA insists it should have attorney fees because the trial court's granting of mandamus necessarily implies that the Board was not negotiating "in good faith" as required by the statute—despite the Board's reliance on the advice of counsel.

The contention is largely answered by *Liberal-NEA v. Board of Education*, supra, where we denied attorney fees while holding that a mandamus order should have been issued. We there noted:

". . . We have held that the underlying test to determine whether or not damages and attorney fees should be allowed in a mandamus action is whether the refusal of the public official, commission or board to perform the duty imposed by law was reasonable under all the facts and circumstances. (*Barten v. Turkey Creek Watershed Joint District No. 32*, 200 Kan. 489, 438 P. 2d 732.)" (p. 233.)

There, as here, there was a breach of the statutory duty to negotiate "in good faith." There, as here, the breach was occasioned by a subjective good faith belief on the part of the board that it was doing all the law required of it. There, as here, there was a

first encounter with a new and complicated law, in which both parties were uncertain of their footing.

The trial court here found that both parties acted in the utmost good faith in their efforts to comply with the act as they understood it. That finding is amply supported by the record. The fact that the Board's legal premise may have proved to be faulty in some respects, after this court has spoken on the subject for the first time, does not make their conduct in the first instance "unreasonable." We therefore concur in the trial court's finding that attorney fees should be denied.

## CONCLUSION

We note in closing that we have examined a wealth of material dealing with the new and rapidly evolving field of collective negotiations in public employment. Cases from other jurisdictions proved to be of little value in construing our own statute because each state has its own philosophy and each statute has its own peculiar phraseology; none has the legislative history of our own act. Most of the acts from other states are reproduced, analyzed and characterized in the Commission Report, cited above. For results similar to those reached here, under an act with analogous provisions, see *West Hartford Education Assn., Inc. v. DeCourcy,* 162 Conn. 566, 295 A. 2d 526 (1972).

From what has been said it follows that the trial court did not err in granting either the temporary or the permanent order of mandamus, but did err in the restrictive view it took of the Board's duty to negotiate. The judgment is accordingly modified to provide that future negotiations shall encompass also those matters indicated as being negotiatble in Part II of this opinion, and that such negotiable items as are agreed upon shall be submitted by the negotiating teams to the Board and to the members of the negotiating unit for ratification under the terms outlined in Part I hereof.

As so modified, the judgment is affirmed.

APPROVED BY THE COURT.