No. 50,218

GARDEN CITY EDUCATORS' ASSOCIATION, *Petitioner,* v. THE HONOR-ABLE BERT J. VANCE, JUDGE OF THE 25TH JUDICIAL DISTRICT OF THE STATE OF KANSAS, and BOARD OF EDUCATION, UNIFIED SCHOOL DISTRICT NO. 457, FINNEY COUNTY, KANSAS, *Respondents.*

(585 P.2d 1057)

Opinion filed October 28, 1978.

*Wesley A. Weathers,* of Crane, Martin, Claussen, Hamilton & Barry, of Topeka, argued the cause, and *Barry K. Gunderson,* of Mangan, Dalton, Trenkle & Gunderson, of Dodge City, was with him on the brief for the petitioner.

*Ward E. Loyd,* of Calihan, Green, Calihan & Loyd, of Garden City, argued the cause, and *Curt T. Schneider,* attorney general, and *Charles A. Briscoe,* deputy attorney general, were with him on the brief for the respondents.

The opinion of the court was delivered by

OWSLEY, J.: This is an original action in mandamus in which the petitioner, Garden City Educators' Association (Association), seeks to compel the respondent, the Honorable Bert J. Vance, to order that impasse resolution procedures between the Association and the Board of Education (Board), be commenced pursuant to K.S.A. 1977 Supp. 72-5426. Judge Vance found these procedures could not be implemented in time to meet the mandatory cutoff date pertaining to collective negotiations as set forth in *National Education Association v. Board of Education,* 212 Kan. 741, 512 P.2d 426 (1973) (Shawnee Mission), and directed the negotiations be halted. The issue on appeal is to determine whether such negotiations may be halted prior to the parties reaching agreement or exhausting the impasse resolution procedures. We hold such procedures to be mandatory. Upon a finding of impasse the district court must order that impasse resolution procedures commence in accordance with statutory provisions and continue until they are completed or terminated by mutual agreement of the parties.

The Association, recognized as the "professional employees' organization" of U.S.D. 457 (K.S.A. 1977 Supp. 72-5413[e]), and the Board conducted negotiations during the winter of 1977 and spring of 1978 concerning the terms and conditions of teacher employment for the 1978-79 school year. As required by 72-5423(a), the parties exchanged their lists of items to be negotiated by the December 1 deadline. The negotiating teams thereafter conducted eighteen two-hour sessions over a 168-day period from December, 1977, through May 24, 1978.

A tentative agreement was reached on May 5, 1978, the provisions of which were submitted to the Board and the Association for ratification, pursuant to K.S.A. 72-5421. The Association rejected the agreement after voting three times in an effort to obtain a majority vote. On June 2, 1978, the Association filed a petition in Finney County District Court asking that the judge declare an impasse in the negotiations, pursuant to K.S.A. 1977 Supp. 72-5426. The petition also requested that if an impasse were found to exist, impasse resolution procedures should be ordered in accordance with 72-5427 through 72-5429.

The parties came before Judge Vance on June 9, 1978, at which time he found an impasse did exist between the parties. The judge stated, however, that:

"[T]o attempt to carry out the impasse proceedings further at this time would be a nullity, and . . . the question of whether or not an impasse exists is moot."

He stated further that the impasse procedures could not be completed by July 1, 1978, and that such proceedings would have had to be completed by June 1 in that particular district in order for a proper time to be allowed for the preparation of the school budget, according to the procedure set forth in the 1973 Shawnee Mission case.

The Association also alleges the Board issued unilateral contracts to the members of the "Unit" (all professional employees except administrative employees of U.S.D. 457) on June 16, 1978, and that the Board required the contracts be signed and returned by 5:00 p.m. on June 28, 1978. The Board stated that failure to do so would result in the teachers being required to teach during the 1978-79 school year under the provisions of the 1977-78 contracts.

The matter is before this court to require Judge Vance to order that the impasse resolution procedures commence in accordance

with K.S.A. 1977 Supp. 72-5427 and to order that this court stay, by way of a restraining order, the requirement of the Board that the contracts be signed and returned no later than June 28, 1978. The latter request was resolved when the Board stipulated that the rights of teachers who signed unilaterally-issued contracts would not be prejudiced in the resolution of legal issues presented in the mandamus action.

On July 21, 1978, pursuant to stipulations filed by the parties, and a prehearing conference, this court directed the parties to brief only one issue:

"[T]he issue to be briefed by the parties is whether or not professional negotiations pursuant to the Collective Negotiations Act, K.S.A. 1977 Supp. 72-5413 et seq., can be halted prior to the parties either reaching agreement or exhausting the impasse resolution procedures amended into the Act by the 1977 Legislature."

Since the enactment of the statutes pertaining to collective negotiations, we have had four occasions to consider their effect and application.

In *Liberal-NEA v. Board of Education,* 211 Kan. 219, 505 P.2d 651 (1973), we construed the statute (K.S.A. 72-5413[e]) to mean that a previously recognized professional employees' organization could continue in such capacity until its status was terminated in a legally effective manner.

In *National Education Association v. Board of Education,* 212 Kan. 741, 512 P.2d 426 (1973) (Shawnee Mission), we considered questions relating to the duty to negotiate proper negotiable items, the time period for negotiations, and actions which constituted undermining of the negotiations. We held the parties are required to make a good faith effort to reach an agreement. The key to determining whether a subject is proper for negotiation is how direct the impact of an issue is on the well-being of the individual teacher, as opposed to its effect on the operation of the school system as a whole. We considered the time for negotiations and found that proper preparation of a school budget required advance knowledge of salary demands by teachers. In order to meet budget submission deadlines, negotiations between the board and teachers' association must terminate not later than July 1, possibly earlier, depending upon the size of the school district and the complexity of its budgetary procedures. We discussed the NEA's claim that the board was undermining the negotiating team and found no violation.

Our third occasion to examine the Collective Negotiations Act was in *Seaman Dist. Teachers' Ass'n v. Board of Education,* 217 Kan. 233, 535 P.2d 889 (1975). We found it was the intent of the legislature to authorize a professional employees' organization to sue or be sued in the association's name and confirmed the law would not authorize a strike by professional employees.

In an effort to provide a more balanced situation for the bargaining process, the 1977 legislature enacted amendments to the Act, which expanded and clarified the scope of mandatory negotiations (K.S.A. 1977 Supp. 72-5413[*l*]), provided a detailed and complete process for the declaration of impasse and its resolution (72-5426 through 5429), and allowed for a specific and detailed right of action to prevent prohibited practices (72-5430). These amendments, and especially those dealing with the impasse resolution, are stated in mandatory terms, and rigid and narrow time-lines are established for each step. For example, a "summary hearing" must be held by the district court within five days after the filing of the petition. If impasse be found the district court "shall order that impasse resolution procedures be commenced in accordance with K.S.A. 1977 Supp. 72-5427 and 72-5428" (72-5426[*c*]). Once this declaration is made, the clerk of the court is required to deliver a copy of the findings and orders to the secretary of human resources "forthwith." In accordance with 72-5427, the secretary of human resources, upon receipt of the district court declaration of impasse, "shall appoint forthwith a mediator to assist in resolving the impasse." The mediator is provided a period of seven days to resolve the impasse and thereafter the mediator or either party may certify that mediation has failed, thus initiating the fact-finding proceedings. Upon a certification or written request that the mediation has failed, the secretary shall appoint "forthwith" a fact-finding board in accordance with 72-5428 and the fact-finding board must submit its report within ten days of appointment, which period can be extended by the parties for not to exceed seven additional days.

In the fourth case considered by this court, *In re NEA-Topeka, Inc.,* 224 Kan. 582, 581 P.2d 1187 (1978), we held the declaration of an impasse in negotiations is not a final decision appealable under K.S.A. 60-2102(*a*)(4).

Only the Shawnee Mission case spoke to the issue involved in

the present action. We must determine whether the amendments containing impasse procedures should be construed as mandatory. Legislative intent should be determined from a consideration of the entire Collective Negotiations Act. Effect must be given to the Act and every part thereof, as well as all other statutory enactments generally bearing on the subject matter. It is the duty of the court, so far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible. *Harris v. Shanahan,* 192 Kan. 629, 635, 390 P.2d 772 (1964); *In re Estate of Diebolt,* 187 Kan. 2, 14, 353 P.2d 803 (1960); *State, ex rel., v. Moore,* 154 Kan. 193, 197, 117 P.2d 598 (1941).

In our judgment it was the intent of the legislature that the impasse resolution procedures supersede the language in Shawnee Mission. We are mindful of the rule that "[w]here a statute has been construed by the highest court having jurisdiction to pass on it, such construction is as much a part of the statute as if written into it originally." *State, ex rel., v. Moore,* 154 Kan. 193, Syl. 4. See also *State v. One Bally Coney Island No. 21011 Gaming Table,* 174 Kan. 757, 761, 258 P.2d 225 (1953). It is not unusual for the judicial construction of a statute to be affected by subsequent amendments to the statute. Such amendments may justify a judicial construction contrary to the court's previous interpretation. *Barke v. Archer Daniels Midland Co.,* 223 Kan. 313, 573 P.2d 1025 (1978).

We have long recognized the rule that statutes complete in themselves, relating to a specific thing, take precedence over general statutes or over other statutes which deal only incidentally with the same question, or which might be construed to relate to it. Where there is a conflict between a statute dealing generally with a subject, and another dealing specifically with a certain phase of it, the specific legislation controls. *State, ex rel., v. Throckmorton,* 169 Kan. 481, 486, 219 P.2d 413 (1950). We believe the specific statutes relating to impasse resolution procedures must take precedence over our prior decision in Shawnee Mission. There we sought to provide a logical termination of the negotiations process. In the absence of specific legislation to that effect, we interpreted the negotiations process with a logical and practical cutoff date relating to budget submission. This interpretation must fall by the wayside in the face of specific legisla-

tion mandating an impasse procedure which, if followed to its conclusion, would provide the logical termination to the process. We believe the legislature intended to effect such a change in the existing law. *Horyna v. Board of County Commissioners,* 194 Kan. 445, 448, 399 P.2d 844 (1965); *State, ex rel., v. Richardson,* 174 Kan. 382, 386, 256 P.2d 135 (1953).

Recently, in *Rogers v. Shanahan,* 221 Kan. 221, 225, 565 P.2d 1384 (1976), we stated:

"It is presumed the legislature had and acted with full knowledge and information as to the subject matter of the statute, as to prior and existing law and legislation on the subject of the statute and as to the judicial decisions with respect to such prior and existing law and legislation."

One of the key arguments the Board advances for retention of a cutoff date in the negotiating process relates to the necessity that all salary disputes be resolved before the deadline for budget submission by the Board. We note that the issue of salary is only one of the many negotiable items discussed during the negotiating sessions. K.S.A. 1977 Supp. 72-5413(*l*) provides a guideline for negotiable items. It reads:

"(*l*) 'Terms and conditions of professional service' means salaries and wages, hours and amounts of work, vacation allowance, holiday, sick and other leave, number of holidays, retirement, insurance benefits, wearing apparel, pay for overtime, jury duty, grievance procedure, disciplinary procedure, resignations, termination of contracts, matters which have a greater direct impact on the well-being of the individual professional employee than on the operation of the school system in the school district or of the community junior college and such other matters as the parties mutually agree upon as properly related to professional service. Nothing in this act, or the act of which this section is amendatory, shall authorize the adjustment or change of such matters which have been fixed by statute or by the constitution of this state."

Although we realize the issue of salary is the most often disputed item in negotiations, we do not believe it was the intent of the legislature that it control the impasse procedures. Retaining a cutoff date for negotiations, particularly one that contemplates only the problems of preparing the budget for the following year, would be to ignore the other important items that are negotiated during these sessions. Furthermore, there appears to be ample evidence advanced by the Association that redistribution of monies among line items is a common practice in school districts. Even though the budget of a school district has been adopted, there remains a degree of flexibility in line item adjustment. To

the extent of the flexibility of the budget, the issue of salaries of teachers continues to be a negotiable item.

The impasse procedures would be negated by a strict budget submission time because the resolution process could be prematurely cut short if not commenced well in advance of July 1. Although the legislature enacted the procedures in contemplation of a swift resolution process, as evidenced by the narrow timelines provided in each step, we note there are several steps which contain built-in delays not controlled by a set time period, which either party could utilize to bog down the procedures. The statute would permit a board to avoid impasse procedures merely by exercising one of the opportunities for delay. The final power of a board to take "such action as it deems in the public interest," (K.S.A. 1977 Supp. 72-5428[f]), coupled with a mandatory cutoff date, would place the board in a much stronger negotiating position than the professional employees' association.

The Board argues the cutoff date should be no later than April 15 (K.S.A. 72-5411 [now May 15 as amended, L. 1978, ch. 292, § 1]) for teachers to notify the Board they do not desire a continuation of their contracts. The Board suggests this date for the following reasons: First, it is more in accord with the practical realities of operating under the Act; second, it provides for more than ample time to complete the collective negotiations process; third, it would benefit both boards of education and teachers, more so the latter; and fourth, it is more in accord with what they perceive to be the true legislative intent.

We agree with the argument as to practicality, but disagree with the argument as to legislative intent. We are again faced with the mandatory language of the Act. We pointed out in Shawnee Mission the deadlines referred to in 72-5411 have nothing to do with issuance of new contracts, but only with the termination of old contracts. Our treatment of the argument of the Board that the budget submission law should not control applies equally to the continuing contract law.

We believe the establishment of an arbitrary cutoff date would be a deterrent to a negotiated contract and contrary to the result sought by the legislature. The utilization of the impasse resolution procedures without a mandatory cutoff date should tend to eliminate any delaying tactics by either party. Once impasse is declared, the procedure must follow its entire course. To delay

without legitimate reason serves neither party and illustrates lack of a "good faith effort" to reach an agreement. K.S.A. 1977 Supp. 72-5413(g).

We hold that once an impasse has been declared, pursuant to K.S.A. 1977 Supp. 72-5426(c), resolution procedures must commence in accordance with the statutory procedure. We direct Judge Vance to order the commencement of impasse resolution procedures.

FROMME, J., not participating.

SCHROEDER, C.J., dissenting: The Supreme Court has previously construed The Professional Negotiations Act, K.S.A. 1977 Supp. 72-5413, *et seq.*, to require rapid action in negotiations in order to reach agreement between the parties involved. In my opinion, the court made an about-face by permitting open-ended negotiations which may not terminate for several years.

The Honorable Bert J. Vance, after hearing all the evidence, found that in order for the Board to comply with the requirements of the Act the impasse proceedings in the Garden City school district would have to be completed by June 1, to give the Board sufficient time for the preparation of the budget. The findings and rulings of Judge Vance, in my opinion, were correct and completely within the law. The parties in this case had reached agreement on all items negotiated, except salaries.

The majority opinion distinguishes the Shawnee Mission case, *National Education Association v. Board of Education,* 212 Kan. 741, 512 P.2d 426 (1973), from the facts presented here. There we considered the time limitation for negotiations under the Act and said:

"What *is* important from the Board's point of view is that it have its salary obligations fixed in time to prepare its budget (and tax levy) for the next school year. The timetable prescribed by the budget law requires a hearing on the proposed budget not later than August 15 of each year (K.S.A. 1972 Supp. 79-2933; K.S.A. 79-1801). Notice of the hearing must be published not less than ten days before then, or by August 5 (K.S.A. 1972 Supp. 79-2929). Obviously the preparation of the multi-million dollar budget required by a unified school district requires several weeks—the time varying, no doubt, with the size of the district. While the record is silent on the actual time required for this district, it is apparent that if June ended with its salary requirements unknown the district's budget officer would be in serious trouble. (See K.S.A. 1972 Supp. 75-4322[u], fixing July 1 as the 'budget submission date' under the Public Employer-Employee Relations Act.)" (p. 754.)

Our court also upheld the trial court's action fixing April 15 as the last day of required negotiations on the facts in the Shawnee Mission case.

In 1977 the legislature of Kansas amended The Professional Negotiations Act, L. 1977, ch. 248, to include a detailed and complete process for the declaration of impasse and its resolution (72-5426 through 5429). Careful reading of Chapter 248, Laws of 1977, indicates the provision for declaration of impasse and its resolution was merely amendatory of the original Professional Negotiations Act. An example is K.S.A. 1977 Supp. 72-5423(*a*), which reads in pertinent part:

"Nothing in K.S.A. 72-5413 to 72-5424, inclusive, *and amendments thereto,* shall be construed to change or affect any right or duty conferred or imposed by law upon any board of education, except that boards of education are required to comply with this act in recognizing professional employees' organizations, and when such an organization is recognized, the board of education and the professional employees' organization shall enter into professional negotiations prior to issuance of the annual teachers' contracts or renewal of the same on request of either party." (Emphasis added.)

K.S.A. 72-5426(*b*) clearly demonstrates that the question of the existence of an impasse is only pertinent under The Professional Negotiations Act if there is a continuing duty to negotiate. See *Wilcox v. Billings,* 200 Kan. 654, 657, 438 P.2d 108 (1968). In the Shawnee Mission case, 212 Kan. 741, Syl. ¶ 7, the court said that duty to negotiate ends no later than July 1. After the adoption of the 1977 amendments, and with the inclusion of impasse resolution procedures, certain procedural timelines were added to The Collective Negotiations Act. There is little question but that the impasse resolution procedures were not intended to add to the negotiation timelines, but were to fit into the previously developed time frame.

The district court, as did this court before it in Shawnee Mission, recognized that not only must the "legislative scheme" of the Act and the "intent" of the legislature be given effect, but also that the "budget law" must also be taken into account in adjudicating this case. These budget laws provide the procedures by which the political process of budgeting is conducted. It is clear that in this process ultimate responsibility must rest with directly elected representatives of the people, here the board of education.

The Honorable Lewis F. Powell, Jr., of the United States Supreme Court in his concurring opinion in *Abood v. Detroit Board of Education,* 431 U.S. 209, 257-58, 52 L.Ed.2d 261, 97 S.Ct. 1782 (1977), noted:

"Collective bargaining in the public sector is 'political' in any meaningful sense of the word. . . . [I]t is also true when public-sector bargaining focuses on such 'bread and butter' issues as wages, hours, vacations, and pensions. Decisions on such issues will have a direct impact on the level of public services, priorities within state and municipal budgets, creation of bonded indebtedness, and tax rates. The cost of public education is normally the largest element of a county or municipal budget. Decisions reached through collective bargaining in the schools will affect not only the teachers and the quality of education, but also the taxpayers and the beneficiaries of other important public services. Under our democratic system of government, decisions on these critical issues of public policy have been entrusted to elected officials who ultimately are responsible to the voters."

Quoting from Summers, *Public Sector Bargaining: Problems of Governmental Decisionmaking,* 44 Cin. L. Rev. 669, 670 (1975), the Supreme Court observed in *Abood* that:

"We have developed a whole structure of constitutional and statutory principles, and a whole culture of political practices and attitudes as to how government is to be conducted, what powers public officials are to exercise, and how they are to be made answerable for their actions. Collective bargaining by public employers must fit within the governmental structure and must function consistently with our governmental processes; the problems of the public employer accommodating its collective bargaining function to government structures and processes is what makes public sector bargaining unique."

Stated simply, but perhaps most accurately, the question addressed by the district court was whether the legislature intended to nullify the Kansas "budget laws" by providing open-ended arbitration (as here urged by petitioner), or rather intended that collective bargaining "fit within and function consistently with" the governmental budgeting processes. The district court was faced with the question whether the legislature intended that the statutory impasse resolution provisions of the Act be the end point whenever they may occur, and thus the "budgeting laws must give way," or whether the legislature intended that *both* enactments be given meaning and effect.

The district court concluded that the legislature clearly intended that the provisions of *both* the Act and the "budget laws" be given meaning. The precept that statutes *in pari materia* must be construed together so that both are given force and effect is

settled in Kansas. *E.g., Farm & City Ins. Co. v. American Standard Ins. Co.,* 220 Kan. 325, 552 P.2d 1363 (1976); *Ruthrauff, Administratrix v. Kensinger,* 214 Kan. 185, 519 P.2d 661 (1974); *Claflin v. Walsh,* 212 Kan. 1, 509 P.2d 1130 (1973); *City of Overland Park v. Nikias,* 209 Kan. 643, 498 P.2d 56 (1972); *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 176 Kan. 561, 271 P.2d 1091 (1954).

Our court was confronted with a construction of The Professional Negotiations Act as amended in the case of *In re NEA-Topeka, Inc.,* 224 Kan. 582, 581 P.2d 1187 (1978). There we indicated the speed with which negotiations should be conducted in order to reach agreement and said:

"[T]he legislature has evidenced its intent that the specific procedures for impasse mediation under The Professional Negotiations Act *move with smoothness and rapidity toward agreement* by the parties involved.

"The Act does not provide for piecemeal appeals from every adverse order of the trial court. *In fact, the rapid time sequence established by the legislature for implementing and carrying out the impasse procedure indicates an opposite intent.*" (p. 585.) (Emphasis added.)

That impasse proceedings were not intended to be something isolated and apart from The Professional Negotiations Act, but were intended to be a part of negotiations is indicated by the following statement from the NEA-Topeka case:

"The finding of impasse merely triggers the procedure by which *future negotiations* are to be conducted, hopefully toward a *rapid* and successful conclusion." (p. 585.) (Emphasis added.)

Moreover, no mention was made in the 1977 amendment of The Professional Negotiations Act by the legislature of the "cutoff" date created by the Shawnee Mission case. The petitioner herein urges that by such omission, or legislative inaction, the Shawnee Mission case was thereby repealed or reversed. The majority opinion adopted this position, which in my opinion, is erroneous.

This court has held many times that where a statute has been construed by the highest court having jurisdiction to pass on it, such construction is as much a part of the statute as if written into it originally. *State, ex rel., v. Moore,* 154 Kan. 193, Syl. ¶ 4, 117 P.2d 598 (1941). See also *State v. One Bally Coney Island No. 21011 Gaming Table,* 174 Kan. 757, 761, 258 P.2d 225 (1953). The Shawnee Mission case has been the law four years and the

legislature has made no change in the cutoff date established by that decision. Therefore, it must be assumed that the legislature was content with the court's construction of The Professional Negotiations Act as construed in the Shawnee Mission case. In *State v. Beard,* 197 Kan. 275, 416 P.2d 783 (1966), the court abandoned its prior construction of a statute, where the legislature made a substantial departure from the previous enactment which disclosed a change in the legislative concept of the purpose to be served. Here we are dealing *with amendments* to an existing statute rather than a completely new statute. Thus, the rule in *Beard* has no application.

The Collective Negotiations Act in its present form, including the amendments effective in 1977, eliminates many of the roadblocks in the collective negotiation process. What the Act required in its original form (which remains unchanged to this date) is stated in K.S.A. 1977 Supp. 72-5423(*a*):

"[T]he board of education and the professional employees' organization shall enter into professional negotiations prior to issuance of the annual teachers' contracts or renewal of same . . . ."

K.S.A. 1977 Supp. 72-5413(*g*) defines *professional negotiations* to mean "meeting, conferring, consulting and discussing in a good faith effort by both parties to reach agreement with respect to the terms and conditions of professional service." Originally there was no method of determining the existence of "good faith effort" or bringing an end to the negotiation process short of resorting to a time-consuming mandamus proceeding in the local district court. Now, however, the existence of bad faith can be quickly adjudicated through the injunctive medium, pursuant to the 1977 amendments "prohibited practices" section, K.S.A. 1977 Supp. 72-5430.

Likewise, where parties were doing the best they could, but in spite of good faith efforts could not reach an acceptable meeting of the minds, nothing could be done short of sitting out the passage of time until the Shawnee Mission cutoff date was reached, or July 1. (Note that Judge Vance found the budgetary needs of U.S.D. 457 to be such that the cutoff date is June 1.) The remedy for this procedural block was provided by the 1977 legislative amendment creating an "impasse resolution procedure," *i.e.,* K.S.A. 1977 Supp. 72-5426 through 72-5429. The legislature stated in K.S.A. 1977 Supp. 72-5426(*a*):

"If in the course of professional negotiation *either* the board of education or the recognized professional employees' organization, or both, believe that an impasse exists therein, *either party* individually or both parties together may file a petition in the district court. . . asking the district court to find that an impasse exists in professional negotiation and to order the commencement of the impasse resolution procedures . . . ."

By such procedure it became possible to greatly shorten the collective negotiation process through resort to outside, independent opinion in the event parties were stalemated, albeit in good faith. In order to implement this procedure, I believe a cutoff date for negotiations must be retained so that final agreement may be reached within an established time frame.

For the reasons stated it is respectfully submitted the decision of Judge Vance was correct and should be permitted to stand.

McFARLAND, J., joins the foregoing dissenting opinion.