BELOIT EDUCATION ASSOCIATION, and another, v. EMPLOYMENT RELATIONS COMMISSION, Respondent. [Case No. 75–105.]
CITY OF BELOIT, Appellant, v. EMPLOYMENT RELATIONS COMMISSION, Respondent. [Case No. 75–106.]

*Nos. 75–105, 75–106. Argued April 12, 1976.—*
*Decided June 2, 1976.*
(Also reported in 242 N. W. 2d 231.)

44

46

For the appellants there was a brief by *John C. Carlson* and *Lawton & Cates,* and oral argument by *Robert J. Arnot* of *Lawton & Cates,* all of Madison. [Case No. 75–105.]

For the respondent the cause was argued by *Charles D. Hoornstra,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general. [Case No. 75–105.]

For city of Beloit by the Beloit City School Board, its agent, there was a brief by *Herbert P. Wiedemann* and *Foley & Lardner,* all of Milwaukee, and *George Blakely* of Beloit, and oral argument by *Herbert P. Wiedemann.* [Case No. 75–105.]

For the appellant there were briefs by *Herbert P. Wiedemann* and *Foley & Lardner,* all of Milwaukee, and *George Blakely* of Beloit, and oral argument by *Herbert P. Wiedemann.* [Case No. 75–106.]

For the respondent the cause was argued by *Charles D. Hoornstra,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general. [Case No. 75–106.]

For Beloit Education Association there was a brief by *John C. Carlson* and *Lawton & Cates,* and oral argument by *Robert J. Arnot* of *Lawton & Cates,* all of Madison. [Case No. 75–106.]

A brief amicus curiae for the city of Madison Joint School District No. 8 and its agent, the Board of Education, in support of the city of Beloit and its agent the Beloit Board of Education was filed by *Henry A. Gempeler,* city attorney, and *Gerald C. Kops,* deputy city attorney. [Case No. 75–106.]

Robert W. Hansen, J. This is an appeal by a school board and by a teachers' association from a circuit court judgment. That judgment modified and affirmed a ruling of the state employment relations commission. That ruling declared the rights of the school board as employer and of the teachers' association as collective bargaining agent under sec. 111.70 (1) (d), Stats.

*The statute.* This statute (sec. 111.70 (1) (d), Stats.), establishing the right of "collective bargaining" in the public sector in this state, provides as follows:

"(d) *'Collective bargaining' means* the performance of *the mutual obligation* of a municipal employer, through its officers and agents, and the representatives of its employes, *to meet and confer* at reasonable times, *in good faith, with respect to wages, hours and conditions of employment with the intention of reaching an agreement,* or to resolve questions arising under such an

agreement. The duty to bargain, however, does not compel either party to agree to a proposal or require the making of a concession. Collective bargaining *includes the reduction of any agreement reached to a written and signed document. The employer shall not be required to bargain on subjects reserved to management and direction of the governmental unit except insofar as the manner of exercise* of such functions *affects the wages, hours and conditions of employment* of the employes. In creating this subchapter the legislature recognizes that *the public employer must exercise its powers and responsibilities to act for the government and good order of the municipality, its commercial benefit and the health, safety and welfare of the public to assure orderly operations and functions within its jurisdiction, subject to those rights secured to public employes by the constitutions of this state and of the United States and by this subchapter."* (Emphasis supplied.)

*The limits.* As to collective bargaining in the public sector, the underlined portions of the statute establish three categories: (1) Where collective bargaining is required; (2) where collective bargaining is permitted, but not required; and (3) where collective bargaining agreements are prohibited.[1] The obligation of the public employer to "meet and confer" and its right to agree to a policy in a "written and signed document" extends only to matters of "wages, hours and conditions of employment." Beyond such limit is the area of "subjects reserved to management and direction of the governmental unit," where the public employer may, but is not required, to "meet and confer" and may, but is not required, to agree in a "written and signed document." Beyond such limit of voluntary bargaining is the area involving the exercise of the public employer's "powers and responsibilities to act for the . . . good order of the municipality, its commercial benefit and the

---

[1] *Compare: National L. R. Bd. v. Wooster Div. of B.–W. Corp.* (1958), 356 U. S. 342, 348, 349, 78 Sup. Ct. 718, 2 L. Ed. 2d 823.

health, safety and welfare of the public." Here the proper forum for the determination of the appropriate public policy is not the closed session at the bargaining table. More than the bilateral input of the public employer and the employees' bargaining agent is required for deciding the appropriate public policy. Here the multilateral input of employer, employees, taxpayers, citizen groups and individual citizens is an integral part of the decision-reaching process, and bargaining sessions are not to replace public meetings of public bodies in the determination of the appropriate public policy.

 *The parties.* Here we deal with collective bargaining between a local school board and a teachers' association. Both board and association are involved, not only in the collective bargaining process as statutorily defined,[2] but also in the political process as constitutionally assured.[3] The school board is an employer under the statute,[4] and it is also a public body of elected officials, with powers and duties for the operation of the school system in the public interest.[5] As such employer, it must bilaterally "meet and confer" and may agree in a "written and signed document" as to matters involving "wages, hours and conditions of employment." As such public body and as to matters of school management and educational policy, it cannot be required to collectively bargain with the collective bargaining agent for its employees. The teachers' association here is a collective bargaining agent under the statute,[6] and also a professional association of teachers concerned with

---

[2] Sec. 111.70 (1) (d), Stats.

[3] Art. X, sec. 1, Wis. Const., providing: "The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law. . . ."

[4] Sec. 111.70 (1) (a), Stats.

[5] Secs. 120.001 to 120.61, Stats.

[6] Sec. 111.70 (1) (g), Stats.

matters of school system management and educational policy.[7] As such bargaining agent the association can collectively bargain with the board as to matters of "wages, hours and conditions of employment." As a professional association it may also be heard as to matters of school and educational policies, but it makes such contribution or input along with other groups and individuals similarly concerned.[8]

*The problem.* The difficulty encountered in interpreting and applying sec. 111.70 (1) (d), Stats., is that many subject areas relate to "wages, hours and conditions of employment," but not only to such area of concern. Many such subjects also have a relatedness to matters of educational policy and school management and operation. What then is the result if a matter involving "wages, hours and conditions of employment" also relates to

---

[7] *See:* Smith, Edwards and Clark, *Labor Relations Law in the Public Sector* (Bobbs-Merrill 1974) at page 366, quoting Wellington and Winters, *The Unions and the Cities* (1971) at pages 21–30, the authors stating: " '. . . [S]ome of the services government provides are performed by professionals—teachers, social workers, and so-forth—who are keenly interested in the underlying philosophy that informs their work. . . .

" 'The issue is not a threshold one of whether professional public employees should participate in decisions about the nature of the services they provide. . . . The issue rather is the method of that participation.' "

[8] Summers, *Public Employee Bargaining: A Political Perspective*, 83 Yale L. J. (1974), 1156, 1195, the author stating: "To say that curriculum content is not a proper subject of bargaining does not mean that teachers have no legitimate interest in that subject or that they should not participate in curriculum decisions. It means only that the bargaining table is the wrong forum and the collective agreement is the wrong instrument. . . . [N]o organization should purport to act as an exclusive representative; the discussions should not be closed; and the decision should not be bargained for or solidified as an agreement. In addition, all of the ordinary political processes should remain open for individuals or groups of teachers to make their views known to the politically responsible officials and thus to influence the decision."

educational policy or school administration? An illustration is the matter of classroom size, subsequently discussed. The number of pupils in a classroom has an obvious relatedness to a "condition of employment" for the teacher in such classroom. But the question of optimum classroom size can also be a matter of educational policy. And if a demand for lowered classroom size were to require the construction of a new school building for the reduced-in-size classes, relatedness to management and direction of the school system is obvious. Would such required result of a new building not be a matter on which groups involved, beyond school board and teachers' association, are entitled to have their say and input? Other courts have faced this same problem. Some limit required bargaining to matters "directly" related to "wages, hours and conditions of employment."[9] Some make the test whether the subject matter is "significantly" related to "wages, hours and conditions of employment."[10] Some make the test whether the subject "materially" affects the working conditions.[11] Commenators appear to agree that drawing the line or making the distinction is not easy.[12]

[9] See: *National Ed. Ass'n v. Board of Ed.* (1973), 212 Kan. 741, 753, 512 Pac. 2d 426, 435, the court holding: "The key, as we see it, is how direct the impact of an issue is on the well-being of the individual teacher, as opposed to its effect on the operation of the school system as a whole." *See also: School Dist. of Seward Ed. Ass'n v. School Dist., Etc.* (1972), 188 Neb. 772, 784, 199 N. W. 2d 752, 759.

[10] See: *Clark County Sch. Dist. v. Local Gov. Emp. Man. Rel. Bd.* (Nev. 1974), 530 Pac. 2d 114, 118, the court holding: "[C]lass size is significantly related to wages, hours and working conditions. . . ."

[11] See: *Aberdeen Ed. Ass'n v. Aberdeen Bd. of Ed. Ind. Sch. Dist.* (S. D. 1974), 215 N. W. 2d 837, 841, the court holding: "It is our opinion that the term 'other conditions of employment' as used in SDCL 3–18–3 means conditions of employment which materially affect rates of pay, wages, hours of employment and working conditions. . . ."

[12] Smith, Edwards and Clark, *supra*, footnote 7, page 379, quoting Perry and Wildman, *The Impact of Negotiations in Public*

■ *The construction.* The state employment relations commission was petitioned to determine by declaratory ruling which of various proposals for bargaining were mandatorily bargainable. It responded by initially concluding that only subject matters that were *primarily* related to wages or hours or conditions of employment were mandatorily bargainable.[13] As to such matters, the school board was *required* to "meet and confer" and collectively bargain as to demands of the teachers' association. This construction of the statute was upheld as reasonable by the reviewing court. We agree. The dictionary defines "primarily" as meaning "fundamentally."[14] It is in this sense of the word that "primarily" is here used. What is fundamentally or basically or essentially a matter involving "wages, hours and conditions of employment" is, under the statute, a matter that is required to be bargained. The commission construed the statute to require mandatory bargaining as to (1) matters which are *primarily* related to "wages, hours and conditions of employment," and (2) the impact of the "establishment of educational policy" affecting the "wages, hours and conditions of employment." We agree with that construction.

*Education: The Evidence from the Schools* (1970), 165–171, the authors stating: " 'First, it should be noted that it is exceedingly difficult to distinguish between "educational policy" and "salaries and working conditions" where teacher bargaining is concerned.' "

[13] The exact language of the WERC holding being: "3. That matters primarily relating to wages, hours and conditions of employment of teachers are not reserved to the management and direction of the school system of the City of Beloit, by its duly elected officials and other agents, within the meaning of Section 111.70 (1) (d) of the Municipal Employment Relations Act, and, therefore, the City of Beloit, and its agent, the Beloit City School Board, and other agents, are required to engage in collective bargaining, as defined in said section of the Act, on such matters, with the Beloit Education Association."

[14] Webster's *New International Dictionary* (3d ed., unabridged), page 1800.

*The application.* Having adopted the "primarily so" test as to the matters where mandatory bargaining is required by the statute, the commission proceeded to apply that test to a variety of the teachers' association demands submitted to the commission for testing. That was correct for we have here a case-by-case approach to specific situations. There was no attempt by the commission and there is none by this court to develop broad and sweeping rules that are to apply across the board to all situations.[15] As did the commission and the reviewing court, we will now proceed to discuss the application of the "primarily so" test to each of the subject areas claimed by the teachers' association to be appropriate subjects for required bargaining.

■ (A) *Teacher evaluation.* A series of proposals relating to teacher evaluation were submitted to the school board by the teachers' association as appropriate subjects for required bargaining. As to two of them, (1) who was to evaluate teacher performance, and (2) assistance to teachers whose evaluations were poor, the commission held that they did not primarily involve "wages, hours and conditions of employment." As to the others,[16] involving procedures to be used in evaluation, the commission held that they did primarily relate to "wages, hours and conditions of employment." The

[15] *See: Pennsylvania Lab. Rel. Bd. v. State Col. A. Sch. Dist.* (Pa. 1975), 337 Atl. 2d 262, 265, the court holding: "We also recognize the wisdom of refraining from attempting to fashion broad and general rules that would serve as a panacea. The obviously wiser course is to resolve disputes on a case-by-case basis until we develop, through experience in the area, a sound basis for developing overall principles."

[16] The proposals can be summarized as follows: "*Teacher Supervision and Evaluation* (1) Orientation of new teachers as to evaluative procedures and techniques, (2) Length of observation period and openness of observation, (3) Number and frequency of observations, (4) Copies of observation reports and conferences regarding same, and teachers' objections to evaluations, and (5) Notification of complaints made by parents, students and others."

circuit court affirmed these holdings. Obviously the area of teacher evaluation relates to "management and direction" as well as to "wages, hours and conditions of employment." However, as to the procedures followed, these matters go to the right of teachers to have notice and input into procedures that affect their job security. On the record that was before it, we uphold the conclusions reached by the commission as to teacher evaluation procedures being mandatorily bargainable.[17]

(B) *Teacher files.* The teachers' association suggested as required bargaining matters certain proposals concerning teacher files and records.[18] The commission found these proposals to relate primarily to "wages, hours and conditions of employment," with bargaining required. The commission incorporated the rationale of its holding as to teacher evaluation, and the reviewing court affirmed, holding the purpose of keeping teacher files to be "for the purpose of evaluating teachers and

[17] *Clark County School Dist. v. Local Government Employee Management Rel. Bd., supra,* footnote 10, using the "significantly related" test, stating: ". . . the evaluation of a teacher's performance is significantly related to a teacher's working conditions inasmuch as the evaluation affects transfer, retention, promotion and the compensation scale."

[18] The proposals can be summarized as follows: *"Teacher Files and Records* (1) Review of personal files and copies of contents therein, and entitlement to representation at such review, (2) Identification of obsolete matters in teacher files, and if obsolete, or otherwise inappropriate to retain, the same shall be destroyed, (3) Prior review of derogatory material and right to submit written answer thereto, the latter to be included in personal file, (4) Conclusion of final evaluation prior to severance, and exclusion of material, received after severance or following receipt of notice of resignation or notice of 'consideration of non-renewal' from teacher files, (5) Limitation on establishment of more than one file per teacher, and (6) Notification, in writing, to teacher of alleged delinquencies, indication of expected correction, and time period therefor, as well as notification of breaches of discipline, and, where possibility of termination exists, notification thereof to Beloit Education Association."

may well affect their continued employment." Once again it is clear that the proposals relate to "management and direction" as well as to "wages, hours and conditions of employment." However the trial court noted that the proposals go only to those complaints or files which have effect on evaluation or continued employment. So limited, the scope of a teacher's personnel file and the right of teacher access to it would appear to relate primarily to "wages, hours and conditions of employment." At least, on the record before us, we affirm the commission holding as to teacher files and records.

■ (C) *Just cause standard.* The teachers' association claimed bargaining was required under the statute as to its proposals regarding the "just cause standard" for disciplinary action against teachers.[19] The commission held that these "just cause" proposals primarily relate to "wages, hours and conditions of employment," and mandated bargaining. The trial court affirmed this holding. As to this holding the school board does not challenge the requirement of bargaining as to a just cause for dismissal. Instead it challenges the bargainability of renewal or nonrenewal of a teacher's contract. Outside of Milwaukee county where teachers have tenure,[20] the state statute provides that, on or before March 15 of each year, the school board "shall give the teacher written notice of renewal or refusal to renew his contract."[21]

---

[19] The "just cause" proposals can be summarized as follows: "*Just Cause Standard* (1) A just cause basis prior to discharge, non-renewal, suspension discipline, reprimand, reduction in rank or compensation, or deprivation of any professional advantage, (2) Permissible suspension with pay, (3) Charges forwarded to School Board, and copies thereof to suspended teacher, Association president, and chairman of Grievance Committee, by certified mail, and (4) Hearing on charges, together with appeal procedures."

[20] *See:* Sec. 118.23, Stats.

[21] Sec. 118.22 (2), Stats.

While there are restrictions on the right not to renew,[22] the school board contends that this statute is not consistent with required bargaining as to renewal or nonrenewal of teacher contracts. The trial court found no conflict, finding the only effect of the "written notice" statute to be that "no labor agreement can alter the dates on which notice of nonrenewal is to be given, or any of its other terms." (Absent notice of nonrenewal, the contract renews itself.) We agree that such setting of a minimum procedure for notice and hearing, before a school board can decide not to rehire a teacher, does not limit or negative the right, also granted by the legislature, to teachers to collectively bargain in areas primarily related to "wages, hours and conditions of employment."[23] On the facts before it the commission was entitled to hold that the proposals relating to the "just cause standard" were mandatorily bargainable.

■ (D) *Teacher layoffs.* The teachers' association submitted certain proposals in the field of teacher layoffs

[22] *See: Muskego-Norway C. S. J. S. D. No. 9 v. W. E. R. B.* (1967), 35 Wis. 2d 540, 151 N. W. 2d 617. *See also: Millar v. Joint School Dist.* (1957), 2 Wis. 2d 303, 312, 86 N. W. 2d 455, requiring dismissal of a teacher under contract to be for "good and sufficient cause."

[23] *See: Richards v. Board of Education* (1973), 58 Wis. 2d 444, 460a, 460b, 206 N. W. 2d 597, holding on motion for rehearing: "Under the act, a school district is considered to be a 'municipal employer,' sec. 111.70 (1) (a), Stats., and this court has no difficulty in concluding that a grievance procedure established by a collective bargaining agreement, and relating to dismissals falls within the embrace of 'wages, hours and conditions of employment' and that the conditions of such an agreement are binding on the parties." Distinguishing *Adamczyk v. Caledonia* (1971), 52 Wis. 2d 270, 190 N. W. 2d 137, handed down prior to the enactment of sec. 111.70 (1) (d), Stats., and involving "a personal employment contract rather than a collective bargaining agreement enacted in accordance with sec. 111.70, Stats."

as mandatorily bargainable items.[24] As to a decrease in the number of teachers "by reason of a substantial decrease of pupil population," the association's proposal was that such layoffs be "only in the inverse order of the appointment of such teachers."[25] While the commission held all of the teacher layoff proposals to primarily relate to "wages, hours and conditions of employment," it is the proposal for seniority in case of layoffs that was challenged on review and is challenged on this appeal. The school board claims an impingement on the right of the board to determine what programs will be reduced and what staff qualifications are needed. The trial court held that nothing in the association proposal, as worded, went to what school programs were to be reduced or eliminated in case of layoff due to a decrease in pupil population. To the suggestion that "a more senior Fourth Grade athletic teacher must displace a less senior Twelfth Grade physics teacher," the trial court responded that "such an absurd result was not required." While terming it a clarification, it then modified the commission holding to require that "a reasonable clarification to that effect be inserted in the collective bargaining agreement if proposed by the School Board." As so clarified and modified, the proposals stop well short of invading the school board's right to determine the curriculum,[26] and to retain, in case of layoff, teach-

[24] The teacher layoff proposals can be summarized as follows: "*Teacher Layoffs* (1) The basis for layoffs, (2) Order of recall, (3) Qualification for recall, (4) Non-loss of previous service credits, and (5) No new or substitute appointments while qualified teachers are in layoff status."

[25] The actual proposal states in part: "If necessary to decrease the number of teachers by reason of a substantial decrease of pupil population . . . [the employer] may lay off the necessary number of teachers, but only in the inverse order of the appointment of such teachers."

[26] *See: Joint School Dist. No. 8 v. Wis. E. R. Board* (1967), 37 Wis. 2d 483, 493, 155 N. W. 2d 78, this court holding: "The

ers qualified to teach particular subjects in such curriculum. As so limited and modified, the proposal, we hold, is one primarily related to "wages, hours and conditions of employment," and hence required to be bargained.

■ (E) *Problem students.* The teachers' association submitted as proper subjects for mandated bargaining a number of proposals involving "problem students."[27] The commission found the proposals to be "ambiguous" and divided them into two categories of student misbehavior: (1) Misbehavior that does not involve threats to physical safety (of the teachers) ; and (2) misbehavior of students that presents a physical threat to the teacher's safety. It then held that the first category was not mandatorily bargainable, and that the second was. The reviewing court continued this sharp distinction, upholding the commission ruling that held the portions of the association's proposals that were required bargaining subjects to be confined "strictly to student misbehavior involving physical threats to the teacher's safety." The trial court also noted a particular association proposal dealing with referral of problem students

contents of the curriculum would be a different matter. Subjects of study are within the scope of basic educational policy and additionally are not related to wages, hours and conditions of employment."

[27] The proposals as to problem students can be summarized as follows: *"Problem Students* (1) Referral of problem students to specialized personnel and others, (2) Relief of teacher responsibility with respect to problem students, (3) Consent of teacher to whom problem student is assigned, (4) Exclusion of problem student from classroom, report thereof, and consultation prior to return to classroom, (5) Teacher self-protection and report of action taken, and (6) Liability insurance coverage and compensation resulting in absence from duty from injuries in performance of teaching and related duties, with no deduction from accumulated sick leave."

for needed counseling.[28] The trial court held that this proposal did not primarily relate to "wages, hours and conditions of employment," and held it not to be mandatorily bargainable. With the limitations set by the commission and the modification made by the reviewing court, we affirm the holding that the proposals as to problem students who present a physical threat to teacher safety are primarily related to "wages, hours and conditions of employment," and are required by the statute to be bargained.

(F) *School calendar.* The teachers' association suggested the school calendar as a required bargaining topic.[29] The commission ruled that "all aspects of the school calendar" were mandatorily bargainable. The reviewing court affirmed this holding, adding that "all that is required of the employer in collective bargaining is to bargain in good faith with respect to proposals submitted by the collective bargaining agent of the employees. An agreement with respect to a particular proposal is not required." The school board challenges this finding of bargainability, relying heavily upon the case, decided prior to the enactment of sec. 111.70 (1) (d), Stats., in which our court held that a school board ". . . need neither surrender its discretion in determining calendar policy nor come to an agreement in the collective-bargaining sense."[30] However, subsequent-

[28] The particular proposal was as follows: ". . . Whenever it appears that a particular pupil requires the attention of special counselors, special teachers, social workers, law enforcement personnel, physicians or other professional persons, such students shall be referred to that particular person."

[29] The association's original proposals raised the subject of school calendar, but no specific proposal was made.

[30] *Joint School Dist. No. 8 v. Wis. E. R. Board, supra,* footnote 26, at page 494, this court also stating: "If the school calendar was subject to collective bargaining in the conventional sense in which that term is used in industrial labor relations under sec.

ly, our court has held: "The school calendar and in-service days are subject to negotiation with the bargaining agent under sec. 111.70 (2), Stats."[31] Given this applicable ruling by this court, we affirm the trial court holding that, while the school board cannot be required to agree or concede to an association demand as to calendar days, it is required to meet, confer and bargain as to any calendaring proposal that is primarily related to "wages, hours and conditions of employment."

(G) *In-service training.* A variety of proposals regarding teacher in-service training were submitted by the teachers' association as proper subjects for required bargaining.[32] With a single exception all such proposals were held by the commission not to primarily relate to "wages, hours and conditions of employment," and, therefore, not to be subject matters where bargaining is re-

111.02 (5), there would be merit to the argument of the school board that its legislative function is being delegated or surrendered and thus the calendar could not constitutionally be a subject of negotiation although it fell within the broad terms of the statute."

[31] *Board of Education v. WERC* (1971), 52 Wis. 2d 625, 633, 634, 191 N. W. 2d 242, this court also holding: "Likewise educational conventions, and whether they are to be considered in-service or school days, and questions of compensation for such days are, we believe, within the statutorily defined area of negotiation on 'wages, hours and conditions of employment.'"

[32] The in-service training proposals included: "The afternoon of the third Thursday of each month will be designated as 'in-service day;' if the third Thursday of any given month falls on a holiday or during a vacation, another appropriate day will be substituted. The calendar for in-service days will be structured jointly by representatives of the association and the central administration. Although the in-service program will be planned to make maximum use of staff talents, outside consultants may be required. In such cases, the board agrees to pay the reasonable costs of said consultants provided that the cost does not exceed $1,000 (one thousand dollars). The time of in-service will be 12:00–4:00. Adequate time for lunch will be provided."

quired.[33] The single exception and the only proposal in this area held to be mandatorily bargainable was the one regarding: "The number of in-service days during the school year, and the day of the week such days will fall." The trial court held this proposal to be a matter of calendaring, and to be governed by the holding, heretofore upheld, as to calendar day proposals being mandatorily bargainable. We agree, noting that the decision of this court making the school calendar subject to negotiation included "in-service days" in its holding.[34] On the record before it the commission was entitled to hold the "in-service days" proposal mandatorily bargainable.

■ (H) *Classroom size.* The teachers' association submitted to the commission as a subject matter requiring mandated bargaining a proposal concerning class size.[35] The commission, on the evidence before it, concluded that the size of a class is not primarily a matter of "wages, hours and conditions of employment" but is primarily a matter of basic educational policy.[36] There-

---

[33] The WERC memorandum stated: "However, we conclude that the type of programs to be held on such days, and the participants therein are not subjects of mandatory bargaining, since we are satisfied that such programs and the participants therein have only a minor impact on working conditions, as compared to the impact on educational policy."

[34] *Board of Education v. WERC, supra,* footnote 31, at page 633.

[35] The proposal as to class size was as follows: "Because the pupil-teacher ratio is an important aspect of an effective educational program, the Board agrees that class size should be lowered wherever possible to meet the optimum standards of one (1) to twenty-five (25). Exceptions may be allowed in traditional large group instruction or experimental classes, where the Association has agreed in writing to exceed this standard."

[36] The WERC memorandum stated: "The size of a class is a matter of basic educational policy because there is very strong

fore, it concluded, "decisions on class size are permissive and not mandatory subjects of bargaining." The trial court affirmed this holding, stating that, on the basis of the evidence before it, the commission could conclude that a school board's prerogatives in making educational policy include the power to decide that class size does affect the quality of education and to set class size accordingly. The commission also held that the size of a class has an impact upon conditions of employment of teachers.[37] So it concluded that: "While the School Board has the right to unilaterally establish class size, it nevertheless has the duty to bargain the impact of the class size, as it affects hours, conditions of employment and salaries." The reviewing court also affirmed this commission holding that, while class size was not bargainable, the impact of class size upon "wages, hours and conditions of employment" was mandatorily bargainable. We affirm the trial court holding, agreeing that the commission was warranted in reaching the conclusions it did.

(I) *Reading program.* The teachers' association claimed that its proposal as to a school reading program was a matter that required bargaining.[38] The commis-

---

evidence that the student-teacher ratio is a determinant of educational quality. Therefore, decisions on class size are permissive and not mandatory subjects of bargaining.

[37] *Id.,* continuing: "On the other hand, the size of the class affects the conditions of employment of teachers. The larger the class, the greater the teacher's work load, e.g., more preparation, more papers to correct, more work projects to supervise, the probability of more disciplinary problems, etc."

[38] The proposal as to a reading program was as follows: "The Board and the Association agree that each child shall have the opportunity to enhance and expand reading skills necessary to allow a child to reach his optimum reading expectancy level. Therefore the Board agrees to assess the reading achievement and the native ability of each child annually. These figures shall be made available to the Association. The necessary staff, materials, and programs shall be furnished for the child found to

sion held that the association's proposal on "reading" related primarily to educational policy,[39] and not to "wages, hours and conditions of employment." It concluded that such proposal was subject to voluntary or permissive bargaining, but that bargaining as to it was not required. The trial court affirmed this holding. The commission further held that: "If a reading program is established, which involves teachers, the impact of the same upon their wages, hours and working conditions, is a subject of mandatory bargaining." This commission ruling was not challenged on appeal, and is here set forth in the interest of completeness. We see no basis upon which it could be successfully challenged.

(J) *Summer school.* The teachers' association sought to have declared mandatorily bargainable its proposals for the initiation of a summer school program.[40] The commission held that such proposal for initiating a summer school program related primarily to basic educational policy, and did not primarily relate to "wages, hours and conditions of employment." Therefore it concluded the proposals for a summer school

be one or more years below his optimum reading expectancy level, to remedy his reading deficit."

[39] The WERC memorandum stated: "It is clear to the Commission that the Association's proposal on 'reading' relates primarily to basic educational policy, and therefore concerns a matter subject to permissive, but not mandatory bargaining. The need for such a program is essentially a determination of whether the District should direct itself toward certain educational goals."

[40] The proposals for a summer program included in relevant part: (1) That a summer program be initiated; (2) that a maximum of ten teachers be employed for a period of one month at a total salary cost of $10,000; (3) that all other teachers involved receive six credits on the salary schedule; (4) all students participating to do so free of charge; (5) federal grants or aid be applied for when and if possible; (6) that the program be under the direction of the director of curriculum; and (7) that the summer workshop be for one month with hours of 8–12 and

were subject to permissive, but not mandatory bargaining. However the commission also held, should the school board determine unilaterally to establish a summer school session, "matters relating to wages, hours and working conditions of teachers participating in a summer school session, are subject to mandatory bargaining." This holding by the commission is not challenged by either party on appeal, and is set forth, this being an action for declaring of rights, in the interests of completeness. We find it to be entirely correct as a conclusion of law.

(K) *Assistance to teachers.* The teachers' association urged that the commission find mandatorily bargainable its proposals for assistance to teachers having professional difficulties.[41] The commission declined so to do, holding instead that the proposals for teacher assistance primarily related to the management of the school system, and were not primarily or even significantly related to "wages, hours and conditions of employment." In explaining its reasons for so concluding, the commission stated in its memorandum: ". . . the proposals involving . . . assistance to teachers having

---

[41] The teacher assistance proposals were as follows: "1. Definite positive assistance shall be immediately provided to teachers upon recognition of 'professional difficulties.' . . . 2. Beginning immediately with the conference after the classroom observation, specific appropriate direction shall be offered to guide the individual toward the solution of his particular professional problem. Suggested actions shall include at least three of the following: (a) Demonstration in an actual classroom situation. (b) Direction of the teacher toward a model for emulation, allowing opportunities for observation. (c) Initiation of conferences with evaluator, teacher and area coordinator or department chairmen to plan positive moves toward improvement of professional classroom performance. (d) Guidance for the teacher toward professional growth workshops. (e) Observation, continued and sustained, by the evaluator to note the day-to-day lessons and their interrelationships. (f) Maintenance and expansion of the collection of professional literature with assigned reading, designed to suggest possible solutions to identified problems."

professional difficulties, and the techniques to be employed in dealing with teachers found to be suffering professional difficulties, reflect efforts to determine management techniques rather than 'conditions of employment.' As such, they are not subjects of mandatory bargaining." The trial court affirmed this holding. While such assistance to teachers having professional difficulties is not unrelated to their continued employment or promotion, it is evident that the primary relatedness is to the "management and direction" of the school system. On the record before it the commission acted properly in so concluding.

 *The standard.* As its standard of review for the commission rulings, the trial court held that standard to be ". . . whether each ruling constitutes a rational interpretation of sec. 111.70 (1) (d), Stats." The trial court held that it is ". . . only when the interpretation by the administrative agency is an irrational one that a reviewing court does not defer to it."[42] It is certainly true, as the trial court observed, that the general rule in this state is that ". . . the construction and interpretation of a statute adopted by the administrative agency charged by the legislature with the duty of applying it is entitled to great weight."[43] However, as this court has made clear, the rule that great weight is to be given and any rational basis will sustain the practical interpretation of the agency charged with enforcement of a statute ". . . does not apply unless the administrative practice is long continued, substantially uniform and without challenge by governmental authorities and

[42] The trial court citing *Wisconsin Southern Gas Co. v. Public Service Comm.* (1973), 57 Wis. 2d 643, 652, 205 N. W. 2d 403.

[43] The trial court citing *Libby, McNeill & Libby v. Wisconsin E. R. Comm.* (1970), 48 Wis. 2d 272, 280, 179 N. W. 2d 805; *Chevrolet Division, G. M. C. v. Industrial Comm.* (1966), 31 Wis. 2d 481, 488, 143 N. W. 2d 532; *Cook v. Industrial Comm.* (1966), 31 Wis. 2d 232, 240, 142 N. W. 2d 827.

courts."[44] In this petition for declaratory rulings, addressed to the state employment relations commission, we have very nearly questions of first impression raised concerning the areas of mandatory bargaining between a school board and a teachers' association under sec. 111.70 (1) (d).[45] Given this situation, we would hold, quoting a very recent case, that ". . . this court is not bound by the interpretation given to a statute by an administrative agency. Nevertheless, that interpretation has great bearing on the determination as to what the appropriate construction should be."[46] It is such "great bearing" or "due weight" standard, not the "any rational basis" test, that we find here applicable. However we here hold that the applicability of such higher standard does not affect the validity of the reviewing court's upholding of the rulings of the commission. The commission's holdings were conclusions of law. We find that, under either standard of review, due weight or great weight, the holdings of the employment relations commission met either test on judicial review.

■■ *The evidence.* As to each ruling or conclusion of law reached by the employment relations commission, the trial court and this court have upheld each such holding as sufficiently supported by the evidence in the

[44] *Wood County v. Bd. of Vocational, T. & A. Ed.* (1973), 60 Wis. 2d 606, 618, 211 N. W. 2d 617.

[45] *See: Whitefish Bay v. Wisconsin E. R. Board* (1967), 34 Wis. 2d 432, 444, 445, 149 N. W. 2d 662, this court holding: "In view of this poverty of administrative experience and of the recent passage of the statute giving rise to this strictly legal question of jurisdiction, perhaps the court ought to examine it afresh as a question of law not especially involving administrative expertise. For such a question the court feels free to substitute its own judgment for that of the administrative agency." Citing *Pabst v. Department of Taxation* (1963), 19 Wis. 2d 313, 323, 120 N. W. 2d 77.

[46] *Milwaukee v. WERC* (1976), 71 Wis. 2d 709, 714, 239 N. W. 2d 63.

record before the commission. The teachers' association attacks the evidence admitted as part of that record, specifically contending that the admission and use of certain book and magazine articles offered by the school board was improper. The claim is that such evidence, admitted over objection, was (1) hearsay, (2) without foundation having been laid, (3) inadmissible as opinion evidence, (4) admitted without opportunity to cross-examine the authors of the articles, and (5) irrelevant and immaterial. The articles objected to referred to many of the subjects involved in the commission's ruling. The exhibits challenged were copies of articles that appeared in various educational journals on these subjects. We hold that they were properly admitted. The employment relations commission has broad discretion as to what evidence it can consider. The applicable statute provides that: "Agencies may take official notice of any generally recognized fact or any established technical or scientific fact; but parties shall be *notified either before or during hearing or by full reference* in preliminary reports or otherwise, of the facts so noticed, and they shall be afforded an opportunity to contest the validity of the official notice." (Emphasis supplied.)[47] With notice given as to admission of the articles and that they would be considered by the commission, we would find the "notified during hearing" provisions of the statute here complied with. In any event, with this a petition for a declaring of rights under a statute, we find no error committed by the commission or prejudice established to the Beloit Education Association. Here the commission set forth the proposals of the association and, in its findings and conclusions, moved directly from such proposals to determining whether each proposal related

[47] Sec. 227.10 (3), Stats. Sec. 227.10 (1) also provides: "Agencies shall not be bound by common law or statutory rules of evidence. . . ."

primarily to "wages, hours and conditions of employment" so that bargaining was required. As the trial court held: "The test of whether a finding is supported by substantial evidence is whether the evidence supporting the finding is such that a reasonable man could accept the same to support the conclusion made."[48] And, exactly as the trial court concluded, "[U]nder this test the questioned finding needs no evidentiary facts to support it other than the wording of the Association's proposal to which this finding relates." The state employment relations commission was asked for a declaratory ruling as to whether each or all of various proposals were subjects of mandatory bargaining. The commission examined each such proposal and ruled as to whether it was a subject of required bargaining under sec. 111.70 (1) (d), Stats. Its holdings or conclusions as to each have been modified in part and, as modified, affirmed by the circuit court and again affirmed by this court. We find no error or ground for reversal in the procedures followed by the commission and upheld on judicial review.

*By the Court.*—Judgment affirmed.

---

[48] The trial court citing *Robertson Transport. Co. v. Public Serv. Comm.* (1968), 39 Wis. 2d 653, 658, 159 N. W. 2d 636.