505 A.2d 905

**BOARD OF EDUCATION OF MONTGOMERY COUNTY**

**v.**

**MONTGOMERY COUNTY EDUCATION ASSOCIATION, INC.**

No. 883, Sept. Term, 1985.

Court of Special Appeals of Maryland.

March 12, 1986.

Roger W. Titus (Titus & Glasgow, on brief), Rockville, for appellant.

James R. Whattam (Walter S. Levin and Weinberg and Green, on brief), Baltimore, for appellee.

Argued before GILBERT, C.J., and WILNER and ADKINS, JJ.

WILNER, Judge.

We have before us in these cross-appeals a dispute between the Montgomery County Board of Education (County Board) and the Montgomery County Education Association (MCEA), acting as the designated exclusive representative for teachers and certain other professional personnel employed by the County Board. At issue is whether the County Board is required by Md.Code Ann.Educ. art., § 6–408(b) to negotiate with MCEA with respect to (1) the school calendar[1] and (2) the reclassification of employees represented by MCEA.

## I. *Background*

The parties were operating under a collective bargaining agreement that was due to expire June 30, 1984. In the preliminary stage of negotiating a successor agreement, MCEA submitted an initial bargaining proposal that included the two items noted above, as follows:

---

1. The school calendar determines what days during the school year the schools are actually open or, conversely, what days schools are closed for holidays, "professional" days, etc. It would also determine the first and last days of the school year.

| "ARTICLE SECTION | CONCEPT | RATIONALE |
|---|---|---|
| 6.New(4) | Calendar (including summer school) to follow. | Negotiate fundamental working conditions. |
| 13.G. | No reclassification without negotiation. | Protect unit members' salary. Eliminates penalties for unit members. |
| | Grandfather class of current employees and reclassify new employees." | |

The presentation of those items in that form was in furtherance of what MCEA regarded as "concept bargaining," *i.e.,* proposing for discussion general concepts and rationales rather than precise contract language.

Relying on a 1970 ruling of the State Board of Education (State Board) to the effect that the school calendar and the classification of jobs were matters within the sole prerogative of the local school board, the County Board declined to negotiate those two matters. MCEA thereupon filed with the State Board a "Charge of Unfair Labor Practice," complaining about the County Board's position and asking the State Board to overrule its 1970 decision and order the County Board to negotiate on those items. The "charge" was filed with the State Board pursuant to Educ. art., § 2–205(e), which provides:

"(1) Without charge and with the advice of the Attorney General, the State Board shall explain the true intent and meaning of the provisions of:

(i) This article that are within its jurisdiction; and

(ii) The bylaws, rules, and regulations adopted by the Board.

(2) The Board shall decide all controversies and disputes under these provisions.

(3) The decision of the Board is final."

The State Board referred the matter to a hearing examiner, who conducted an evidentiary hearing. At the outset of

the hearing, both sides seemed to agree that the issues before the State Board were not purely legal ones but also involved questions of educational policy.

On the issue of the school calendar, the MCEA witness, Walter Rogowski, claimed that teachers had been impacted "quite severely" by the school calendar, which led MCEA to regard the calendar as "a very, very important working condition and a priority in our bargaining." The severe impact, he explained, arose from the facts that (1) in the 1982–83 school year, the teachers lost a day that had historically been provided for them to attend the Maryland State Teachers Association convention, (2) the last day of that school year happened to be a Monday, which deprived teachers of a long weekend, and (3) the first day of the 1983–84 school year was a Friday, which deprived them of another long weekend.

County Board officials Robert Cooney and Stephen Rohr responded that the school calendar affects many groups other than teachers, among them parents, students, and other employees of the County Board, many of whom were paid by the hour or day. The County Board agreed to negotiate the number of days above the State law minimum that school would be open, but felt that the setting of the actual calendar was a County Board prerogative. If the calendar were mandatorily negotiable, they added, the County Board would have to negotiate it not only with MCEA but also with two other unions—the MCCSSE, which represents some 5,600 classified employees (bus drivers, cafeteria workers, etc.) and MCCASP, which represents about 400 central office administrators, principals, and vice-principals.

Upon this evidence, the hearing examiner recommended no change in the State Board's 1970 ruling that county boards were not required to negotiate the school calendar. She acknowledged two contrary decisions in other States based on the notion that the school calendar is related to hours and conditions of employment (*City of Beloit, Etc. v.*

*Wis. Employment, Etc.,* 73 Wis.2d 43, 242 N.W.2d 231 (1976)) or that the teachers' substantial interest in planning their summer activities outweighs any claim of interference with the county board's right to manage the school district (*Westwood Community Schools,* 1972 MERC Lab.Op. 313, Mich.Empl.Rel.Comm.), but simply found the reasoning behind those decisions unacceptable. The State Board, upon further review, adopted that recommendation, and, on MCEA's appeal, the Circuit Court for Montgomery County affirmed. The issue is before us on MCEA's cross-appeal.

The classification issue is a bit more complex. Apparently, all positions in the county school system are classified, but there is more than one classification system. Teachers have one classification system; it consists of five classifications, each of which contains 10 or more grade steps through which teachers advance by reason of length of service. Each classification is based on the college degree and number of acceptable post-graduate credits possessed by the teacher. A teacher with a baccalaureate degree and 15 post-graduate credits, for example, falls within Classification B; if and when the teacher receives a master's degree or its equivalent, he or she will move into Classification C.

The teachers' system is not the principal one at issue here. The County Board does negotiate the classifications themselves, the grade steps within each, and the salaries for each classification and grade step, so the basic framework of the system is the subject of collective bargaining. Moreover, because the classifications are based on objective standards of academic achievement and the grade steps are based on length of service, there is little or no discretion or flexibility in determining where each teacher fits and what his or her salary will be.

There is another classification system for "specialist positions," which is somewhat broader than the teachers' system. It has four classifications (F, G, H, and I), each of which has 10 grade steps. Many different kinds of posi-

tions are governed by this system, a few of which (27, involving about 102 employees) come within MCEA's jurisdictional domain. As with the teachers' system, the basic framework of this system, including the salaries for each classification and grade step, is the subject of collective bargaining with the various unions. The issue initially presented to the hearing examiner and the evidence presented in regard to it concerned the process of classifying new positions and reclassifying existing ones.

The County Board contended that this is an ongoing process throughout the year. Existing positions are constantly being reviewed in light of administrative changes that shift responsibilities and duties from one position to another and that therefore may warrant moving the position into a higher or lower classification. New positions are classified based on a variety of factors. Jesse Graham, director of salary administration for the County Board, described the process and the factors considered. In essence, he said that what is involved is taking individual job descriptions and grouping them into classifications based on similarities in such things as "test for selection, kinds of skills, education, abilities, knowledges and so on." The ultimate test is whether "that entire class, all the positions in that class, lend[s] itself to assignment to a particular pay grade, with equity for all the positions in that pay grade." He explained further:

"Well, we're looking, of course, [at] the content of the job. We're looking at the importance of the job, the value of that job as seen by the school system management, we're looking specifically at that number of people they supervise, the scope of their operation, the kind of control that's exercised over their operation; in other words, do they have a lot of flexibility to operate, do they have a lot of very close guidelines that govern how they operate?

The more guidelines and control they have, the tendency to have a lower class; the more policy making, management oriented, more flexibility they have in deci-

sion making, the tendency to go higher in the salary lanes."

Although the County Board informs MCEA when it is considering the reclassification of positions and accepts "input" from the union, it does not regard its decisions to be negotiable. The Board's witnesses prophesied enormous problems if negotiation was required, pointing out that, unlike contract terms, which can be bargained and agreed to in advance, classification decisions are made daily throughout the year. Mr. Cooney feared that "it would become a continual negotiations process" which, in the event of an impasse, might trigger the impasse procedure set forth in Educ. art., § 6–408(d) and create long delays.[2] He was concerned as well that, if the issue were negotiable, MCEA could initiate, rather than simply react to, classifications. In sum, he said: "I just see it as a chaotic situation, it doesn't lend itself to bargaining, because, bargaining is what do you trade for what, and I don't believe classification or reclassification in any system, including a merit system, should be bargained and traded."

MCEA's position was straightforward: Educ. art., § 6–408(b) requires the County Board to negotiate "on all matters that relate to salaries, wages, hours, and other working conditions"; classification decisions relate to those things; *ergo*, they are negotiable. It dismissed the practical problems raised by the County Board by observing that, under § 6–408(d)(7), even in an impasse, the County Board had the power to "make the final determination as to matters that have been the subject of negotiation."

Perhaps in light of the evidence presented by the County Board, MCEA, in a post-hearing memorandum, attempted to narrow the issue by making clear that its demand extended

---

2. Section 6–408(d) provides that, if the State Superintendent of Schools determines that an impasse in negotiations has been reached, with the consent of both sides, the assistance of the State Board can be requested. In the absence of joint consent, a mediation panel must be appointed. Within 30 days, the panel must make a written report and recommendation.

only to the "salary impact" of reclassification decisions, and not to anything more. Even with the issue so limited, however, the hearing examiner, without protest or further clarification from MCEA, still regarded its demand as including the negotiation of individual reclassification decisions involving MCEA members. In that context, she shared the concerns of the County Board that, if the matter was found to be mandatorily negotiable, MCEA would "have the prerogative to initiate salary reclassification studies" and that "constant negotiations with the unions on salary reclassifications will create chaos in the management function to the extent that the statutory grants of power to the County Superintendent and Board to respond to the needs of the school system will be eroded." She therefore rejected the argument that MCEA had the right "to negotiate each salary impact as the reclassification process proceeds during the year...." She did, however, conclude that the County Board was obliged to negotiate "an across-the-board clause" to protect existing employees against any diminution in salary by reason of reclassification. She explained: "MCEA might seek that protection in any number of forms, such as proposals for grandfathering or red-circling.[3] But such a provision does not intrude into the reclassification process itself and would require negotiation only during bargaining for a new collective agreement."

Her recommendation to the State Board on this issue, then, was

---

**3.** It was explained to us at oral argument that, under a "grandfathering" arrangement, the employee would continue, throughout his career, to be paid as though his position had not been reclassified; for salary purposes, the reclassification, as to him, would be ignored. "Red circling," on the other hand, merely protects against any immediate diminution of salary by reason of a reclassification. The reclassified employee is put in whatever grade step in the new classification is necessary to maintain his current salary. "Red circling" does not, therefore, maintain the ultimate earning potential of the employee. The County Board *has* negotiated a "red circling" provision; one was included in the 1983–84 collective bargaining agreement. The County Board regards this as a *permissible* item for negotiation, but not a *mandatory* one.

"to reaffirm Opinion 70–1 with the addendum that MCEA has the right to insist on negotiations on an across-the-board provision to be inserted in the collective bargaining agreement for the purpose of seeking salary protection for incumbents whose positions have been devalued by being placed lower in the salary lanes."

The State Board accepted the general findings and conclusions of the hearing examiner but rejected her determination that an "across-the-board" salary protection clause was negotiable. It concluded:

"The hearing examiner set forth good reasons for her findings that the salary determination incident to the process of classification and reclassification should be a management prerogative and 'a function of administrators who are experts in the reclassification process and who are in a position to see the system and its needs as a whole.' ... Having found this, one cannot distinguish those salary determinations incident to the process of reclassification which have an adverse effect on the salary of an incumbent. Rather, the very same reasons discussed by the hearing examiner in regard to salary determinations generally in classification and reclassification decisions, have led us to conclude that the topic of negotiating an across-the-board provision for the protection of an [i]ncumbent who would suffer a decrease in salary as a result of a reclassification by a county school system should be permissive and not mandatory."

Applying that reasoning, the State Board confirmed in whole its 1970 ruling and held that the County Board was not obliged to negotiate classification or reclassification decisions.

The Circuit Court, upon MCEA's appeal, reversed the State Board on this issue. The scope of the reversal, however, is not altogether clear. The court's order states, in relevant part, that the agency decision was reversed "insofar as said decision held that the salary impact of job reclassifications was not a mandatory subject of negotia-

tions under Section 6–408(b) of the Education Article." That same thought was expressed in the court's oral pronouncement—that "the reclassification so relates to the salaries and wages that the right of the bargaining is mandatory under Section 6–408" and that the State Board erred in not requiring the County Board to grant to MCEA "the right to bargain in regard to the reclassification, insofar as it impacts upon the salary."

Although it is apparent that the reversal is limited to *re* classification decisions and does not include the classification of new positions, it is not clear whether the court intended to adopt the recommendation of the hearing examiner that negotiations be limited to an "across-the-board" clause in the collective bargaining agreement or to require negotiation of individual reclassification decisions as well. At oral argument MCEA continued to argue that the salary impact of individual reclassifications is mandatorily negotiable, and so we must view the court's order in the broadest context as approving that view.

## II. *Scope of Review*

In almost any appeal from an order or decision of the State Board there is presented a threshold question of the proper scope of judicial review. That is because the Legislature has invested that Board, by statute, "with the last word on any matter concerning educational policy or the administration of the system of public education." *Wilson v. Board of Education*, 234 Md. 561, 565, 200 A.2d 67 (1964). The Board possesses " 'a visitatorial power of the most comprehensive character.' " *Id.*, 565 (quoting *Wiley v. School Comm'r*, 51 Md. 401, 406 (1879)). As explained in *Zeitschel v. Board of Education*, 274 Md. 69, 81, 332 A.2d 906 (1975):

"We think it beyond question that the power of visitation vested in the State Board is one of general control and supervision; it authorizes the State Board to superintend the activities of the local boards of education to keep them within the legitimate sphere of their operations, and

whenever a controversy or dispute arises involving the educational policy or proper administration of the public school system of the State, the State Board's visitatorial power authorizes it to correct all abuses of authority and to nullify all irregular proceedings."

As broad as this authority is, it is not unlimited. As noted in *Zeitschel* and in *Halsey v. Board of Education,* 273 Md. 566, 572, 331 A.2d 306 (1975), it does not include the power "to finally decide purely legal questions" and it cannot be exercised fraudulently, in bad faith, in breach of trust, or "in direct contravention of statute." *See also Resetar v. State Bd. of Education,* 284 Md. 537, 399 A.2d 225, *cert. denied* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979).

What we take from these pronouncements is that the scope of judicial review depends upon the nature of the controversy and that it may fall within any one or more of three categories. Where the matter at issue is a "purely legal question," the State Board's determination is not binding on a reviewing court; if the court believes that the board has flat-out misconstrued the law, it is entitled, and indeed obliged, to substitute its view of the law for that of the board and deal with the board's order accordingly. The test in that limited setting is whether the board's legal conclusion was right or wrong. If, conversely, the issue relates to the State Board's findings of fact, "judicial inquiry is limited to deciding whether on the record the State Board could reasonably make the finding it did...." *Zeitschel, supra,* 274 Md. at 82–83, 332 A.2d 906. That is the normal standard of review of agency decisions; the court may not substitute its judgment for that of the agency, but looks only to see if there was any substantial evidence to support the agency finding. If there is such evidence, the finding must be affirmed even if the court disagrees with it and would not have reached the same finding upon that evidence.

■ The third possible category is where the issue is not one of fact or one of law, but represents a determination of educational policy, including, as noted in *Zeitschel*, "the proper administration of the public school system of the State." In that sphere, the State Board's ruling is "final."

Although occasionally an issue will fall neatly into one of these categories (*see, for example, Zeitschel*, which involved findings of fact, and *Halsey*, where, despite implications on educational policy, the State Board's order was found to be in direct contravention of a statute), it is not infrequent that the State Board's decision rests upon some combination of its view of the facts, the law, and sound educational policy. In such a case, the principles governing judicial review become a bit scrambled.

The Court of Appeals dealt with a somewhat analogous problem in *Davis v. Davis*, 280 Md. 119, 372 A.2d 231, *cert. denied* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), when it sorted out the scope of appellate review of child custody decisions: in reviewing findings of fact, the "clearly erroneous" standard applies; in reviewing questions of law, the appellate court applies a "right/wrong" test and is free to substitute its judgment; "when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion." *Id.*, 126, 372 A.2d 231.

That same kind of analysis, we think, can be applied to appeals from the State Board. As in *Zeitschel*, the court should review the agency's fact-findings under the traditional substantial evidence-"clearly erroneous" standard; it should review pure questions of law on a "right/wrong" standard; and it should defer to the board entirely on issues of educational policy.[4]

---

4. We need not consider here whether the State Board's authority over educational policy is so complete as to withdraw it from review even

### III. *This Case*

■ It seems clear from the State Board's order that the Board did not view the issues before it as exclusively ones of fact, law, or educational policy but as implicating all three. The statute—§ 6–408(b)—was, of course, the heart of the matter; but, in judging whether the school calendar and reclassification decisions fell within its purview, it relied on certain facts found by the hearing examiner with respect to the impact of requiring negotiation of those issues and then viewed that impact in terms of its conception of the proper administration of the public school system. The court, on the other hand, looked at the issues solely in terms of the statute—were they within its purview? It concluded that questions pertaining to the school calendar were "matters not contemplated by the legislature to require bargaining," but that reclassification "so relates to the salaries and wages that the right of the bargaining [*sic*] is mandatory under Section 6–408."

In light of the principles stated in Part II, we think that the court unduly narrowed its focus and that, as a result, it erred in reversing the State Board on the classification issue. Its judgment on that issue will therefore be reversed.

Both sides seem to recognize that the collective bargaining statutes in question here—Educ. art., §§ 6–401—6–411 —envisage three categories of issues: those that a county board has no authority to subject to collective bargaining, those that a board *may*, if it chooses, submit to collective bargaining, and those that it *must*, upon demand of a designated employee representative, submit to that process. In *Bd. of Educ. v. Carroll Co. Educ. Ass'n*, 53 Md.App. 355, 452 A.2d 1316 (1982), and *Howard, Bd. of Educ. v. Howard, Educ. Ass'n*, 61 Md.App. 631, 487 A.2d 1220 (1985), *petition for cert. pending*, we addressed the first

---

under an "abuse of discretion" standard. Language in some of the Opinions would suggest that absent fraud, bad faith, or breach of trust this is so.

category. Fully aware of the statutory mandate of § 6–408(b) to negotiate on "all matters that relate to salaries, wages, hours, and other working conditions," we nevertheless held in the Carroll County case that a county board "may not negotiate or delegate its statutory responsibility to determine tenure." 53 Md.App. at 359, 452 A.2d 1316. In the Howard County case, we stated, more broadly, that county boards "cannot bargain away matters dealing with the very establishment of educational policy," although they may bargain "on matters dealing with the implementation of that policy." 61 Md.App. at 647, 487 A.2d 1220.

By withdrawing those kinds of issues from the collective bargaining process, we necessarily recognized that § 6–408(b) cannot be read in a vacuum. Nearly every policy adopted or decision made by a county board will have some effect on (and therefore "relate to") the "salaries, wages, hours, and other working conditions" of school system personnel, but, despite the language of § 6–408(b), that does not mean that every such policy or decision must be subjected to collective bargaining. Some policies, of course, may be either so clearly and directly related to those matters or so clearly foreign to them as to make their susceptibility to mandatory collective bargaining purely a matter of law, in which event, as we have observed, the State Board does not necessarily have the final word. But the school calendar and reclassification decisions are not of that type; their relationship to the salaries, wages, hours, and other working conditions of MCEA members is more tenuous, and yet, at the same time, they have a significant bearing on the administration of the public school system.

Once the principle set forth in the Carroll County and Howard County cases is recognized, it becomes clear that, except in those instances where inclusion or exclusion is purely a matter of law, the "true intent and meaning" of § 6–408(b) is laced with educational policy considerations that, under § 2–205, are to be determined by the State Board. MCEA does not question the factual findings made by the hearing examiner and adopted by the State Board

with respect to the disruption to the administration of the county school system that would flow from subjecting the classification process to collective bargaining. Those findings, then, stand unimpeached. In light of those findings, it is plain that the State Board properly regarded the issues as affected by significant questions of educational policy and therefore acted within its authority in explaining the true intent and meaning of § 6–408(b) as to those issues. They were not pure questions of law, and the State Board's decision should therefore have been regarded as final.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; COSTS TO BE PAID BY MCEA (APPELLEE/CROSS–APPELLANT).